Exhibit D to Ferber Declaration
Part 3

116

ANDERSON

1

2 tell you that you wouldn't have to offer

3 any testimony other than in the form of

4 that affidavit?

5      A.    Yeah, his lawyer said I

6 probably wouldn't have to testify.  They

7 said it would be a block party in

8 Brooklyn.

9      Q.    Which lawyer was this?

10      A.    Victor.

11      Q.    Victor Dunlop?

12      A.    Yeah, I think so.

13      Q.    Do you recall when you first

14 communicated with Victor Dunlop or he

15 first communicated with you?

16      A.    I don't remember exactly.

17 It was during that same week.

18      Q.    It was within less than a

19 week after your first meeting with

20 Mr. Jones?

21      A.    Yes.

22      Q.    And did you first hear from

23 Mr. Dunlop by telephone or by some other

24 method?

25      A.    Telephone.

ANDERSON

Q.    And do you recall what he
said to you when he called you?

A.    Yeah.  He was telling me
that -- like he said whatever -- he said,
I don't know exactly what Antonne told
you, but he said he's a pretty good dude,
he's a man of his word, I'm not gonna get
into that, but if you come onboard with
us, you know, it'll be a block party.

Q.    Did you ever tell Mr. Dunlop
that you had never read The Family?

A.    Yes.

Q.    And did he say anything in
response to you when you told him that?

A.    No.  He just said that, you
know, whatever you and Antonne discussed,
I don't know what it was, but whatever he
says, he's a man of his word.

Q.    Did Mr. Dunlop ask you to
sign an affidavit at any point in time?

A.    He asked me to look over it,
and I told him that I had to get it to my
lawyer, you know, it's gonna take a few
days and I'll get back to him.

118

ANDERSON

1

2      Q.    Do you recall whether he

3  asked you to look at the affidavit after

4  you had told him that you had never read

5  The Family?

6      A.    Yeah.

7      Q.    He did?

8      A.    Yeah.  I mean, he had sent

9  me other affidavits later on.

10      Q.    How many affidavits do you

11  recall Mr. Dunlop sending you?

12      A.    I think it was one other

13  affidavit.  And then some months had

14  passed, and I talked to Antonne, and, you

15  know, he was texting me back and forth,

16  and he said that they would represent me

17  in suing Damon, you know, on a

18  contingency.  And he was saying, you

19  know, that he knew he worked there --

20  worked with Roc-A-Fella in some fashion

21  or something, and he knew them guys, you

22  know, he grew up with them or whatever

23  and he knew 'em.

24      Q.    Who said this?

25      A.    Victor or one of them dudes.

119

```
                        ANDERSON
 1
 2          Q.      You think it was Victor
 3    Dunlop who said that?
 4          A.      Yeah, yeah.
 5          Q.      And do I understand you to
 6    be saying that he said he would represent
 7    you in a claim against Damon?
 8          A.      Yeah.
 9          Q.      Did he condition the
10    proposal to represent you in a suit
11    against Mr. Dash upon your doing
12    something?
13                  MR. WOTORSON:  Objection to
14          form.
15    BY MR. FERBER:
16          Q.      On what, if anything, was
17    the offer to represent you against
18    Mr. Dash conditioned?
19          A.      He said if I signed the
20    affidavit, then he would represent me
21    with the Damon Dash case.
22          Q.      Did he say anything about
23    the terms under which he would represent
24    you against Damon Dash?
25                  MR. WOTORSON:  Objection to
```

120

1                    ANDERSON
2         form.
3                    THE WITNESS:  What do you
4         mean by the terms?
5    BY MR. FERBER:
6         Q.    Well, was anything said by
7    Mr. Dunlop about how or whether he would
8    be compensated if you retained him to
9    represent you in a suit against Mr. Dash?
10         A.    No.
11         Q.    Do you recall how many times
12    you spoke with Mr. Dunlop?
13         A.    Maybe three times.
14         Q.    Do you recall when the last
15    time was?
16         A.    Maybe the beginning of
17    February.
18         Q.    The beginning of this
19    February?
20         A.    Yeah.  It was either the end
21    of January or the beginning of February.
22    It was recent, pretty recent.
23         Q.    Do you recall anything about
24    what was said in that last call?
25         A.    Just that he was telling me

121

ANDERSON

1
2   that Jay Z -- I wouldn't have to worry
3   about Jay Z 'cause he was going to be
4   released from the case, so any fears that
5   I had about, you know, testifying against
6   Damon and Jay Z, I don't have to worry
7   about it.
8            You know, just talking about
9   the case, you know, like -- I mean, we
10  talked for maybe like 45 minutes or
11  something just about Antonne, me coming
12  onboard, him representing me and the
13  numbers of what -- like Damon had just
14  got a check from Lions Gate for like
15  $750,000.  I was asking him did he get a
16  chance to go over my agreement that I had
17  with them and did I have a case against
18  them.
19           He was telling me about the
20  guy Abdul Malik getting a check from
21  Lions Gate, and I asked him did he know
22  how many DVD units were sold, and he said
23  he hadn't gotten that information yet,
24  you know, just that kind of talk.
25           Q.    Did Mr. Dunlop tell you

122

```
 1              ANDERSON
 2    anything about how big of a check Abdul
 3    Malik got from Lions Gate?
 4              MR. WOTORSON:  Objection to
 5         form.
 6    BY MR. FERBER:
 7         Q.    You can answer.
 8         A.    Like $50,000.
 9         Q.    Do you recall what you said
10    to Mr. Dunlop on that occasion?
11         A.    Why the "f" did he get
12    $50,000 when he didn't write nothing.
13    You know, he kept emails, that he had
14    emailed Lions Gate and they just recently
15    not too long ago gave him a check, so I
16    was kind of pissed about that.
17         Q.    Do you recall anything else
18    that you said?
19         A.    To him about that?
20         Q.    No.  Anything else that you
21    said at all on that call with him?
22         A.    Yeah, that I would give him
23    a call back after I read through the
24    retainer agreement that he had sent, and
25    he said he sent a couple of emails and
```

123

                    ANDERSON

1

2    one was a affidavit and one was a

3    retainer agreement.  And, you know, that

4    he would -- I told him I would get back

5    with him after I send that stuff and he

6    called me a couple times after that and I

7    didn't pick up.

8         Q.    So that was actually the

9    last time that you talked to him?

10        A.    Yes.

11        Q.    And on that occasion when

12   you said you spoke to him for

13   approximately 45 minutes, was anything

14   said about your signing an affidavit or

15   not signing an affidavit?

16             MR. WOTORSON:  Objection to

17        form.

18             MR. FERBER:  I'll rephrase.

19   BY MR. FERBER:

20        Q.    On that occasion when you

21   spoke with Mr. Dunlop, what, if anything,

22   was said about you signing an affidavit?

23        A.    That if I signed the

24   affidavit, then, you know, they would

25   represent me during this Damon Dash suit,

124

ANDERSON

1    

2    that I would -- and he kept saying about

3    Jay Z being released and I wouldn't have

4    to worry about that, and that's pretty

5    much it.  Just sign the affidavit and he

6    would represent me on this other case.

7    So I asked him if he could

8    find out how many units were sold, you

9    know, that kind of stuff, to read over my

10    agreement, make sure I had a case against

11    Dame, and said it looks like you do, you

12    know, I wouldn't tell you if you didn't.

13    Q.   Do you recall anything else

14    about that conversation?

15    A.   Not right now, mow.

16    Q.   And to the best of your

17    recollection, have you had any other

18    telephone conversation with him since?

19    A.   No, I haven't.

20    Q.   Have you received any

21    written communication, email or

22    otherwise, from him since?

23    A.   Since the emails that he

24    sent me?

25    Q.   No, since the conversation

125

1                    ANDERSON
2   we were just talking about.
3        A.    Yeah, he sent the emails and
4   I didn't open 'em.
5        Q.    Okay.  To the best of your
6   recollection, when he did this call that
7   we have been discussing take place?
8        A.    About a month-and-a-half
9   ago.
10        Q.    Did you ever tell Mr. Dunlop
11   in words or in substance that you were
12   not comfortable signing the affidavit?
13        A.    Yeah, in the beginning.
14        Q.    In the beginning meaning at
15   what point in time?
16        A.    When I got the first
17   affidavit and spoke to him.
18        Q.    But that was not reiterated
19   by you in words or substance in this last
20   conversation that you've been describing
21   with him?
22        A.    No, we didn't really talk
23   about that.  We just talked about, you
24   know, like what Lions Gate said who was
25   getting what, and, you know, stuff that,

126

ANDERSON

you know, kind of pissed me off with the
whole, you know, Damon and the whole
Lions Gate thing.

    Q.    During this 45-minute call,
did you and Mr. Dunlop discuss things
that were unrelated to State Property?

    A.    Unrelated?

    Q.    Yeah, that had nothing to do
with it?

    A.    No.

    Q.    You said earlier that in an
earlier communication Mr. Dunlop had
asked you, I think you used the term,
come onboard in the case; is that right?

    A.    Right.

    Q.    Was come onboard his phrase
or yours?

    A.    That was his phrase.

    Q.    What did you understand him
to mean by that?

    A.    If I sign the affidavit.

    Q.    Did you and Mr. Dunlop ever
discuss any sort of financial interest or
financial -- strike that.

127

```
1                    ANDERSON
2            Did you and Mr. Dunlop ever
3    address the issue of any financial gain
4    that you might have if you came onboard?
5         A.    Yeah.  He said that if I
6    sign the affidavit and he represented me,
7    he said it looks like I got a case of at
8    least $200,000 with Dame Dash.
9         Q.    And did he say anything
10    about -- well, what, if anything, was
11    said about what interest in that you
12    might have?
13         A.    It was mainly about the Dame
14    Dash suit.
15         Q.    So just to be clear, was
16    anything said about you obtaining any
17    sort of financial interest or
18    compensation if you signed the affidavit
19    that you were being asked to sign, and by
20    that I mean compensation that would come
21    from any settlement with or judgment that
22    Mr. Jones might get?
23         A.    No.
24         Q.    Mr. Dunlop never said that?
25         A.    No.
```

128

1                    ANDERSON
2         Q.    But Mr. Jones, as I
3    understand it from before, had said
4    something like that?
5              MR. WOTORSON:  Objection to
6         form.
7              THE WITNESS:  Yes.
8    BY MR. FERBER:
9         Q.    To the best of your
10   recollection, what did Mr. Jones say
11   about an interest that you might have?
12             MR. WOTORSON:  Objection to
13        form.
14   BY MR. FERBER:
15        Q.    What, if anything, did
16   Mr. Jones say in that regard?
17        A.    He said I would get a
18   percentage, and, you know, he's a
19   credible dude in the streets, he's a man
20   of his word, and I'm like, but I'm
21   dealing with the same situation, like I
22   trusted Damon and I ain't seen nothing,
23   and me and Damon had like a friendship
24   relationship; I trusted Will, and I
25   didn't see nothing.

129

ANDERSON

1                  ANDERSON

2         I keep trusting folks and

3  they not delivering on what they say,

4  and, you know, I don't really know you,

5  so why would I expect any different.  And

6  he's like I'm a man of my word, I promise

7  you, you know, you'll be taken care of.

8         At first I asked him could

9  he put it on paper and he was like no, I

10  can't do that because it will jeopardize

11  this case.  So he said, you know, trust

12  me on it, and, you know, I'll make sure

13  you get what you supposed to get.

14      Q.    When was this conversation?

15      A.    This was March when we first

16  talked.  We met like a week or so after

17  that down in south Philly.  He came

18  passed my mom's and we sat in the car and

19  talked.

20      Q.    This was March of 2007?

21      A.    Yeah, 2007.

22      Q.    I'm sorry, were you finished

23  with your answer?

24      A.    Yeah.  You know, we just

25  talked about, you know, trusting him and

130

```
 1                    ANDERSON
 2    this is not something I can just decide
 3    overnight, this is going to take me some
 4    time.
 5            So I said well, let's just
 6    keep in contact and I'll feel your
 7    character out and see what type of dude
 8    you are.  And he had a friend of his that
 9    worked at a hotel, and he gave me
10    discount rooms and stuff like that.  So
11    he arranged for that to happen on a few
12    occasions.  A couple times it didn't
13    happen, and I got a attitude with him,
14    and I was like, you know, you say you a
15    man of your word, if you say you do it,
16    then let me see you do it, and that was
17    sort of like what I was judging his
18    character on.
19            MR. WOTORSON:  Before you go
20        to the next question, Ms. Court
21        Reporter could you just read the
22        gentleman's response back?
23            (Whereupon, the court
24        reporter read the requested
25        portion of the record.)
```

132

ANDERSON

1

2     A.    When I didn't sign the

3 affidavit.

4     Q.    When was that in time?

5     A.    It was in July.  We kind of

6 had a big argument about it.

7     Q.    What did he say to you

8 during that argument?

9     A.    You need to be a team

10 player, and like, you know, you come

11 onboard, and, you know -- this is the

12 kind of stuff you'll get, you'll get

13 discount rooms and stuff like that there,

14 and that's when we was sending those

15 texts back and forth.

16     Q.    Other than discounted rooms,

17 were there any other favors done for you

18 by Mr. Jones?

19     A.    No.

20     Q.    Did Mr. Jones ever mention a

21 numerical percentage that you would

22 receive as part of a settlement?

23     MR. WOTORSON:  Objection to

24     form.

25 BY MR. FERBER:

133

1                    ANDERSON

2          Q.    What, if anything, did he

3    say about what percentage you would

4    receive if you cooperated?

5          A.    Five percent.

6          Q.    Do you recall when he said

7    that?

8          A.    It was a week after our

9    first meeting.

10              MR. SERVIN:  Off the record

11          for a second.

12                    -   -   -

13              (Whereupon, a discussion is

14          held off the record.)

15                    -   -   -

16    BY MR. FERBER:

17          Q.    Have you spoken to Mr. Jones

18    about this case in 2008?

19          A.    Yes.

20          Q.    Have you spoken with him

21    about this case in March of 2008, this

22    month?

23          A.    No.

24          Q.    Did you speak with him about

25    the case in February of 2008?

155

1                   ANDERSON

2          A.      Freeway, The Young Guns

3     Chris and Neef, Roc-A-Fella artists.

4                   MR. WOTORSON:  Before you

5              ask the question, what was the

6              date of that email again?

7                   THE WITNESS:  That was

8              7-7-07 at 6:15 p.m.

9     BY MR. FERBER:

10         Q.      Now, you said something

11    about that you and he had been discussing

12    percentages.  Do you recall what you had

13    been discussing about percentages?

14         A.      Just, you know, if I did go

15    over and do the affidavit, and, you know,

16    they won, again, what percentage would I

17    get and was I gonna be able to get it.

18    And I remember I asked him about putting

19    it on paper, and he said it wasn't a good

20    idea for him to do that.

21         Q.      And other than what you

22    testified to earlier, do you remember

23    anything about what percentage numbers

24    were discussed at this time?

25                  MR. WOTORSON:  Objection to

156

                    ANDERSON

1

2        form.

3              THE WITNESS:  No, it stayed

4        at the same percent.

5   BY MR. FERBER:

6        Q.    Okay.  You said you were

7   using certain artists that you had

8   mentioned?

9        A.    Right.

10       Q.    Now, was Roc-A-Fella Films

11  involved with that film at all?

12       A.    No.

13       Q.    It was not?

14       A.    No.

15       Q.    Was Roc-A-Fella Records

16  involved other than --

17       A.    Just artists.

18       Q.    Just the artists?

19       A.    Right.

20       Q.    Okay.  Did you have any

21  understanding as to whether the artists

22  in question were under an exclusive

23  contract with Roc-A-Fella Records?

24       A.    Yeah, I understand that they

25  were.

363

1                    ANDERSON

2    1999?

3         A.    No, I wouldn't be surprised.

4         Q.    And in this conversation

5    that you had with this person in the

6    barbershop, do you remember when this

7    conversation occurred?

8         A.    That occurred after

9    production of State Property.

10        Q.    Now, did you ever serve as a

11   runner in any organized, you know --

12        A.    No.

13        Q.    Okay.  You told us earlier

14   that you, yourself, you know, used to

15   sell drugs.  Did you work for any

16   particular people or were you

17   independent?

18        A.    I started off working for

19   somebody and then I did it independently.

20        Q.    But you were not working for

21   any of the large organized syndicates in

22   the Philadelphia area, were you?

23        A.    No.

24        Q.    Okay.  Now, you also told

25   Mr. Ferber, and correct me if I'm wrong,

364

ANDERSON

1

2    and maybe I misheard him or heard you,

3    but Mr. Ferber asked you if you were a

4    part of JBM, and do you remember what you

5    said?

6            A.    Yeah, a little bit.

7            Q.    How were you a little part

8    of JBM?  That wasn't true, was it?

9            A.    I started off working for --

10           Q.    You started working for JBM?

11           A.    The cousin of the captain,

12   you know, that's who I was working with.

13           Q.    You were working with a

14   cousin of a captain?

15           A.    Right.

16           Q.    Was the cousin of the

17   captain in JBM?

18           A.    Yeah.

19           Q.    Okay.  So are you now saying

20   you were in JBM at one point?

21           A.    Well, I mean, I wasn't

22   initiated, I didn't get a ring, I wasn't

23   no official member, but, you know, you

24   know what they say about association,

25   guilty by association.

365

1                    ANDERSON

2          Q.    So what you want to say is

3    that you were associated with JBM, but

4    you were never a member of JBM?

5          A.    Yeah, I was never a member

6    of JBM.

7          Q.    You were associated with a

8    cousin of a captain of JBM?

9          A.    Yes.

10         Q.    And you're saying that you

11   believe the cousin of the captain was a

12   member of JBM, had a ring and everything.

13              MR. FERBER:  Objection.

14   BY MR. WOTORSON:

15         Q.    Did the cousin have a ring?

16         A.    No, he didn't have a ring.

17         Q.    Was he initiated?

18              MR. FERBER:  Objection.

19              THE WITNESS:  I don't

20         remember what he was.

21   BY MR. WOTORSON:

22         Q.    Well, you also told counsel

23   that almost 80 percent of what you wrote

24   in the screenplay came from things that

25   you had heard on the street or that you