Exhibit P to Ferber Declaration
Part 2

FROM :KJMPLLC                    FAX NO. :7184039593                Feb. 29 2008 02:45PM  P3

4b. In *State Property*, while sitting in an after hours club, Beans is complaining to Baby Boy about being broke and his desire for a large home, and that they need to come up with a large amount of purchase money in order to buy enough cocaine to take over the city of Philadelphia by controlling the city's drug trade.

4c. The ideas of the leaders of each group to purchase a large amount of cocaine in order to take over the city of Philadelphia but lacking enough purchase money and discussing these goals in an after hours club are substantially similar.

5a. In *The Family*, the "NRP" decided that their ultimate goal would be to have the rival drug dealers and mini-organizations either working for them or being supplied by them. Moreover, the motto associated with Anthony and his "NRP" crew was to either *"Be good or be gone."*

5b. In *State Property*, after realizing the ultimate goal of the "ABM" crew, which was to have the rival drug dealers and mini-organizations either working for them, being supplied by them or being murdered by them, and after murdering a rival drug dealer named "Futch", Beans made it known that the motto associated with him and his ABM crew was to either *"Get down or lay down"*.

5c. The ultimate goals of each group are substantially similar. The four (4) word phrase of each group leader to be used as an identifier are substantially similar.

6a. In *The Family*, the "NRP" crew initially received cocaine from their connect, "Vinny", but they soon realized that he would not be able to satisfy their demand. Therefore, they eventually "cut out the middleman" and dealt directly with June and his

11

crew of Colombians that had a base of operations in Miami Beach, Florida, to which they often traveled in order to purchase several kilograms of cocaine on each trip.

6b.    In *State Property*, Beans and Baby Boy realized that in order to get a larger quantity and better quality of cocaine at more competitive prices, they would eventually have to "cut out the middleman". Therefore, they traveled to Miami Beach, Florida to meet the new connect, "Mario" and his crew of Columbians in order to purchase several kilograms of cocaine.

6c.    Although there was no strife between them, both Anthony and Beans cut out the middleman and traveled themselves to Miami Beach, Florida in order to personally purchase larges kilograms of cocaine. The manner in which both leaders made conscious decisions to assume the risk involved in personally purchasing the weight of cocaine, as opposed to sending a worker, as well as, assuming the risk in whatever strife may develop by cutting out the middleman is the same.

7a.    In *The Family*, while doing the deal in Miami Beach, Mark told Anthony that the cocaine they were getting was close to "90 percent pure."

7b.    In *State Property*, while in Miami Beach, after testing the cocaine that they were purchasing, Mario looked at Beans and Baby Boy and stated in part, "See, es puro" (it's pure).

7c.    The quality of cocaine purchased by each group is substantially similar.

8a.    In *The Family*, Anthony disclosed his feelings of discomfort to Mark with the new connect in Miami Beach because not only did they "cut out the middle man", but he also

12

PAGE 4/10 * RCVD AT 2/29/2008 2:37:06 PM [Eastern Standard Time] * SVR:NY21/7 * DNIS:6932 * CSID:7184039593 * DURATION (mm-ss):04-44

FROM :KJMPLLC                    FAX NO. :7184039593               Feb. 29 2008 02:45PM  P5

felt uncomfortable because he did not understand the Spanish being spoken by the cocaine suppliers.

8b.  In *State Property*, Beans was extremely uncomfortable while in Miami Beach with the new connect and expressed this to Baby Boy stating in part, "I don't trust these Spanish speaking Gwala Gwalas" ... "We just cut out the middle man".

8c.  The feelings of discomfort expressed by the leader of each group with the new suppliers based on the fact that the suppliers were speaking Spanish coupled with the fact that each group "cut out the middleman" is the same.

9a.  Throughout the plot of *The Family*, although Anthony often speaks of the healthy relationship he desires with his girlfriend Lauren and their daughter Shatora, his actions prove otherwise as he almost completely ignores the two in favor of his business and another woman, Kimmy.

9b.  Throughout the plot of *State Property*, Beans often speaks of the healthy relationship he has with his girlfriend Aisha and alleges that he would do anything for his unnamed daughter; however, shortly after his daughter's fifth birthday party, he appears to completely ignore his daughter and Aisha in favor of his business and the "ABM" crew.

9c.  The fact that each group leader expresses a desire to have a healthy relationship with their respective families, although neither character manifested his desire but instead showed more time, commitment and interest to their business and business partners is substantially similar.

13

PAGE 5/10 * RCVD AT 2/29/2008 2:37:06 PM [Eastern Standard Time] * SVR:NY21/7 * DNIS:6932 * CSID:7184039593 * DURATION (mm-ss):04-44

FROM :KJMPLLC                    FAX NO. :7184039593           Feb. 29 2008 02:46PM  P6

10a. In *The Family*, after purchasing the large quantities of cocaine from Miami Beach, the "NRP" crew members give a description of the manner in which they will take over city of Philadelphia, including giving detailed descriptions of which section of the city is controlled by which member of the "NRP" crew.

10b. In *State Property*, after purchasing the large quantities of cocaine from Miami Beach, Beans gives a detailed description of the manner in which the "ABM" crew was to take over the city of Philadelphia, including detailed descriptions of which section of the city is controlled by which member of the "ABM" crew, stating in part, "We [sic] taking over the city of Philly like John Street".

10c. The manner in which each member gave an accurate description of their plans to take over the city of Philadelphia, including each section of the city being assigned to each member of each respective group is substantially similar.

11a. In *The Family*, Anthony describes the ability to "enjoy the fruits of our labor", referring to the hard work put in on the streets of Philadelphia by the "NRP" crew.

11b. In *State Property*, while having a meeting with the members of his "ABM" crew and prior to rewarding them with women and jewelry, Beans describes the hard work put in on the streets of Philadelphia and that it is time to "enjoy the fruits of our fucking labor".

11c. The manner in which each leader acknowledges the hard work put in by their respective groups and describes it as "the fruits of our labor" is substantially similar.

14

PAGE 6/10 * RCVD AT 2/29/2008 2:37:06 PM [Eastern Standard Time] * SVR:NY21/7 * DNIS:6932 * CSID:7184039593 * DURATION (mm-ss):04-44

FROM :KJMPLLC                FAX NO. :7184039593             Feb. 29 2008 02:46PM P7

12a. In *The Family*, the members of the "NRP" crew shopped for diamond rings, which they ultimately ordered from "this Jewish Jeweler", and were inscribed with the initials "NRP", to signify their unity and success.

12b. In *State Property*, Beans awarded himself and the members of the "ABM" crew that were "down from day one" with diamond rings that they purchased from "Eli" played by Jacob Arabo a/k/a Jacob the Jeweler, that were inscribed with the initials "ABM" to signify their unity and success.

12c. The fact that the respective founding members of each group were awarded with diamond rings purchased from a Jewish jeweler, bearing the groups' respective initials, is the same.

13a. In *The Family*, while pregnant with their daughter, Anthony's girlfriend advises him that she cannot stay in her parent's home any longer, thus alerting the reader that Anthony needed to purchase a home for himself and his family.

13b. In *State Property*, while complaining to Baby Boy, Beans refers to having to sneak around his girlfriend's parent's home because they do not have a home of their own, thus expressing to the viewer that he desperately needed to purchase a home for himself and his girlfriend.

13c. The fact that the leader of each group feels pressured by the living arrangement with their respective girlfriends and this motivates them to make money at any cost in order to purchase a home is substantially similar.

15

FROM :KJMPLLC                FAX NO. :7184039593              Feb. 29 2008 02:47PM  P8

14a. In *The Family*, the "NRP" crew dealt violently with rival drug organizations that were robbing their dealers on the street corners as well as, robbing their "stash houses."

14b. In *State Property*, the "ABM" crew robbed rival drug dealers on the street corners, as well as, rival dealers delivering to drugs to their "stash houses".

14c. The fact that rival drug dealers were either being robbed by or robbing the members of the respective groups, as well as, involving their "stash houses" is substantially similar.

15a. In *The Family*, the men devised a plan to retaliate on a rival drug dealer named Jabril by using a woman that was romantically involved with a member of the "NRP" in order to set Jabril up to be murdered.

15b. In *State Property*, the men devised a plan to set up Sharef, a rival drug dealer by using a woman that became romantically involved with a member of the "ABM" crew, who in turn set up Sharef to be murdered.

15c. The fact that a woman who was romantically involved with a member of the respective groups and was used to set up a rival drug dealer to be murdered is substantially similar.

16a. In *The Family*, since the "NRP" crew was making so much money and they figuratively took over the city of Philadelphia; they were forced to bribe the local police departments in order to keep the business flowing.

16b. In *State Property*, since the "ABM" allegedly took over every section of the city of Philadelphia, Baby Boy was seen making bribery payments to the local police patrolling those sections.

FROM :KJMPLLC                    FAX NO. :7184039593              Feb. 29 2008 02:47PM P9

16c.   The fact that both groups were bribing local police departments in order to assure their businesses would prosper is substantially similar.

17a.   In *The Family*, Shawn, a founding member of the "NRP" crew, dealt with a heroin dealer in order to make more money, and this was viewed by the other members as not only being greedy, but also as being disloyal to the "NRP" crew. Ultimately, Shawn was set up by his own crew and murdered.

17b.   In *State Property*, Blizz, a founding member of the "ABM" crew, complained that Beans was the only member making "any real money", and this was viewed by Beans and Baby Boy as not only being greedy, but also as being disloyal to the "ABM" crew. Ultimately, Blizz was set up by Beans and killed in a shoot out with police.

17c.   The fact that a founding member of each crew was seen as being disloyal and greedy and ultimately set up by their own crew to be murdered is substantially similar.

18a.   In *The Family*, in reference to Shawn's obvious greed, a founding member of the "NRP" crew blatantly stated, "We are going to have to remove the weak link to tighten the chain."

18b.   In *State Property*, in reference to Blizz's obvious envy and greed, Beans blatantly stated, "We can't have no [sic] weak links in this family"...

18c.   The fact that a member of each respective crew not only recognized but expressed their opinion about another member's greed and both used phrase "weak link" in describing the soon murdered members is substantially similar.

17

19a. In *The Family*, Anthony's girlfriend begged him to "get out of the fast life" because she had a dream that he was killed. Hence, although she was aware that Anthony was a drug dealer and she accepted the perks of such a lifestyle, witnessing a murder in her dreams caused her to beg him to stop dealing drugs.

19b. In *State Property*, Beans' girlfriend Aisha witnessed her friend Tonya murdered by a rival drug crew led by "Boss Dame". Although she was well aware that Beans and his "ABM" crew were drug dealers and she accepted the home, jewelry and other perks that came with such a lifestyle, witnessing a murder caused her to go into a state of shock wherein she begged Beans to stop dealing drugs.

19c. The role played by each leader's girlfriend in accepting the perks that come with such a volatile lifestyle but experiencing the same stimuli, namely a murder, and as a result begging each leader to stop dealing drugs is substantially similar.

20a. In *The Family*, Anthony owned several automobile detailing shops across the city as well as, in Camden, Trenton and Newark.

20b. In *State Property*, Ceaser was a character that owned an automobile detailing shop in Philadelphia and it was there that Beans shot him several times. Ceaser wound up being the character that was to ultimately testify against Beans putting him away for life.

20c. The fact that an automobile detailing shop was even mentioned in both *The Family* and *State Property* is substantially similar.

18

PAGE 10/10 * RCVD AT 2/29/2008 2:37:06 PM [Eastern Standard Time] * SVR:NY21/7 * DNIS:6932 * CSID:7184039593 * DURATION (mm-ss):04-44

**INTERROGATORY NO. 5:** For each element listed in response to Interrogatory No. 5, [sic] describe any aspect in which you do not contend those items are substantially similar.

**RESPONSE:** Subject to the General Objections, which are incorporated herein, Plaintiff responds as follows:

That the elements listed in response to Interrogatory No. 5, namely paragraphs 1, 2, 6, 8, and 12 are not substantially similar because they are the same.

**INTERROGATORY NO. 6:** Identify each of the "opportunities to exploit the Family in other mediums" and the "opportunities for expanding the goodwill associated with the Family" of which Plaintiff contends he was deprived, as alleged in paragraphs 43 and 44 of the complaint.

**RESPONSE:** Subject to the General Objections, which are incorporated herein, Plaintiff as follows:

Please see response to Interrogatory No. 1.

**INTERROGATORY NO. 7:** Identify all facts, documents and/or evidence which you contend support the allegation made in paragraph 88 of the Complaint that "Defendants have, by the actions alleged above, willfully and with knowledge infringed and will continue to willfully infringe Jones's valuable copyright in and to The Family," as said allegation applies to each of the separate defendants.

**RESPONSE:** Subject to the General Objections, that are incorporated herein, Plaintiff responds as follows:

All facts applicable to defendants Damon Dash and Roc-A-Fella Films, Inc. that support the allegations made in paragraph 88 are as follows:

On or about July 1998, plaintiff and Ronald Welton met with Damon Dash and Carline Balan at 14 John Street, New York, New York 10038 specifically for the

19

purposes of discussing Jones's vision of creating a film based on the contents of The Family. During this meeting, plaintiff presented Damon Dash with a projected budget for creating the film, as well as, sales projections in anticipation of the success of such as project. Plaintiff further advised Damon Dash that if he read The Family, he would be convinced that The Family could become a successful full-length feature film. At the conclusion of this meeting, plaintiff handed Damon Dash two copies of The Family and they agreed to meet after Labor Day in 1998. Shortly after this meeting but prior to Labor Day in 1998, Carline Balan contacted plaintiff via phone on behalf of Damon Dash in order to set up another meeting. During this phone conversation, Damon Dash informed plaintiff that he read The Family and that he would like to have a second meeting to discuss The Family and the possibility of creating a full-length feature film based on its contents. Present at this meeting were plaintiff, Ronald Welton, Damon Dash, Shawn Carter, Kareem Burke, Carline Balan, and Kyambo Joshua, all of who were either principles and/or employees of Roc-A-Fella. During this meeting, Damon Dash reiterated to plaintiff that he read The Family in "a few hours" and that he "loved it" and asked whether The Family was based in "fact or fiction". Damon Dash also told plaintiff that believed they could "do business". Plaintiff told Damon Dash that he solely researched and independently wrote The Family and it was based solely in fiction. Also during this meeting, plaintiff asked Shawn Carter whether he read The Family to which he replied, "Yeah". Moreover, Damon Dash asked plaintiff whether he would be interested in selling the rights to The Family and if so, did he have an offer in mind, to which plaintiff responded five hundred thousand ($500,000.00) dollars as consideration for the rights in and to The Family. Shawn Carter replied to plaintiff's offer by advising

20

him that, "they didn't have that kind of money right now" and Damon Dash countered plaintiff's offer with fifty thousand ($50,000.00) dollars. Damon Dash advised plaintiff that the parties "could work this out" and he further advised plaintiff to "let me get back to ya" [sic]. After this meeting the parties never communicated again regarding The Family or any other matters.

All documents applicable to defendants Damon Dash and Roc-A-Fella Films, Inc. that support the allegation made in paragraph 88 of the Complaint were delivered to attorneys for Lions Gate Films, Inc. with Plaintiff's Response to Lions Gate Films, Inc.'s First Set of Request for Document Production.

All other evidence applicable to defendants Damon Dash and Roc-A-Fellas Films, Inc. that supports the allegation made in paragraph 88 of the Complaint is contained herein in plaintiff's response to Interrogatory No. 4, above, as well as, on or about January 29, 2002 Roc-A-Fella Records, a subsidiary of Roc-A-Fella Films, Inc. released the soundtrack to State Property, which was inspired by the motion picture.

All facts applicable to defendant Lions Gate Films, Inc. that support the allegation made in paragraph 88 of the Complaint are as follows:

On or about January 18, 2002 Lions Gate Films, Inc. theatrically released the full-length feature film State Property, which contains substantial similarities if not the same elements as The Family. Moreover, Lions Gate Films, Inc. through its subsidiary Lions Gate Home Entertainment released State Property on DVD. Lions Gate Films, Inc., being the sole distributor of State Property, has exercised mutual control with Damon Dash and Roc-A-Fella Films, Inc. over its creative direction, marketing, promotion and distribution and has a substantial financial interest in the success or failure of the film.

21

PAGE 3/8 * RCVD AT 2/29/2008 2:42:53 PM [Eastern Standard Time] * SVR:NY21/7 * DNIS:6932 * CSID:7184039593 * DURATION (mm-ss):03-30

All documents applicable to defendants Lions Gate Films, Inc. that supports the allegation made in paragraph 88 of the Complaint are in the possession and/or control of defendant Lions Gate Films, Inc. as evinced by said documents being delivered to plaintiff in response to Plaintiff's First Request for the Production of Documents.

All other evidence applicable to defendant Lions Gate Films, Inc. that supports the allegation made in paragraph 88 of the Complaint is contained herein in plaintiff's response to Interrogatory No. 4.

**INTERROGATORY NO. 8:** Identify all facts, documents and/or evidence which you contend support the allegation made in paragraph 89 of the Complaint that "Defendants knowingly, willfully and unlawfully copied The Family" as said allegation applies to each of the separate defendants.

**RESPONSE:** Subject to the General Objections, which are incorporated herein, Plaintiff responds as follows:

Please see response to Interrogatory No. 7, above.

**INTERROGATORY NO. 9:** Identify each act allegedly committed by each of the separate defendants which you contend constitutes unfair competition in violation of the Lanham Act, as set forth in Plaintiff's Second Cause of Action.

**RESPONSE:** Subject to the General Objections, which are incorporated herein, Plaintiff responds as follows:

Please see response to Interrogatory No. 7, above.

**INTERROGATORY NO. 10:** Identify all facts, documents and/or evidence which you contend support the allegation made in paragraph 94 of the Complaint that "Defendants are falsely, willfully, knowingly, and intentionally misrepresenting and falsely designating to the general public, the origin and source of the expression of ideas,

22

characters, plot, setting, storyline, and overall essence of State Property and State Property 2," as said allegation applies to each of the separate defendants.

**RESPONSE:** Subject to the General Objections, which are incorporated herein, Plaintiff responds as follows:

Please see response to Interrogatory No. 7, above.

**INTERROGATORY NO. 11:** Identify each instance of alleged actual confusion by the public as to the source and sponsorship of State Property and State Property 2, including the individual alleged to have been confused, as well as the date, time and place of such confusion.

**RESPONSE:** Plaintiff objects to this interrogatory on the grounds that it is unduly burdensome and overly broad, specifically the request to identify "each instance" of alleged actual confusion.

**INTERROGATORY NO. 12:** Set forth in detail the type of damages Plaintiff is alleging and a computation of each category of damages alleged.

**RESPONSE:** Plaintiff objects to this interrogatory as premature, inasmuch as a computation of each category of damages alleged cannot be determined until the close of discovery. Plaintiff further objects to this interrogatory because up to and including the time of trial Plaintiff has the option of electing either statutory damages or a combination of actual damages and a percentage of each infringer's profits.

**INTERROGATORY NO. 13:** State the total revenue from sales of The Family broken out by year.

**RESPONSE:** Subject to the General Objections, which are stated herein, plaintiff responds as follows:

23

The total revenue from sales of The Family are contained in the documents delivered to attorneys for Lions Gate Films, Inc. with plaintiff's Response to Lions Gate Films, Inc.'s First Set of Requests for Document Production.

**INTERROGATORY NO. 14:** Identify each person whom Plaintiff expect to call as an expert witness at trial, and for each expert identified, state:

(a) the expert's name, address and present employer;

(b) the qualifications of such expert;

(c) the subject matter on which each expert is expected to testify;

(d) the substance of the facts and opinions to which the expert is expected to testify;

(e) a summary of the grounds for the opinion of each such expert.

**RESPONSE:** Plaintiff objects to this interrogatory as premature, inasmuch as experts that Plaintiffs may introduce at trial have yet to be determined. Plaintiff responds they he shall furnish information responsive to this interrogatory in conformity with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York.

**INTERROGATORY NO. 15:** Identify each person who participated or assisted in answering interrogatories.

**RESPONSE:** Subject to the General Objections, which are incorporated herein, Plaintiff responds as follows:

(a) Antonne M. Jones
(b) Victor A. Dunlop
(c) Kenneth J. Montgomery
(d) Ambrose W. Wotorson

24

PAGE 6/8 * RCVD AT 2/29/2008 2:42:53 PM [Eastern Standard Time] * SVR:NY21/7 * DNIS:6932 * CSID:7184039593 * DURATION (mm-ss):03-30

FROM :KJMPLLC                    FAX NO. :7184039593           Feb. 29 2008 02:52PM P7

Date February 21, 2008
Brooklyn, New York

*Attorneys for Plaintiff Antonne M. Jones*

DUNLOP & ASSOCIATES, P.C.

By: _____
Victor A. Dunlop

55 Washington Street, Suite 451
Brooklyn, New York 11201
(718) 403-9261

LAW OFFICES OF AMBROSE W. WOTORSON

By: _____
Ambrose W. Wotorson (AWW-2142)

26 Court Street, Suite 1811
Brooklyn, New York 11201
(718) 797-4861

TO: Tom J. Ferber
Mark A. Tamoshunas
PRYOR CASHMAN LLP
410 Park Avenue
New York, New York 10022

Stephen Wagner
COHEN TAUBER SPIEVACK & WAGNER P.C.
420 Lexington Avenue, Suite 2400
New York, New York 10170

**VERIFICATION**

STATE OF PENNSYLVANIA  )
                       ) ss: 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
COUNTY OF              )

25

PAGE 7/8 * RCVD AT 2/29/2008 2:42:53 PM [Eastern Standard Time] * SVR:NY21/7 * DNIS:6932 * CSID:7184039593 * DURATION (mm-ss):03-30

I, Antonne M. Jones, am the Plaintiff in the above-herein action. I have read the foregoing responses to Defendant Lions Gate Films, Inc.'s Second Set of Interrogatories and know its contents. I am informed and believe, and on those grounds alleged, that the factual matters stated therein are true. The matters stated are true to my own knowledge, except as to those matters that are stated on information and belief, and as to those matters, I believe them to be true.

*Antonne M. Jones*

Sworn to before me this 26th day of February, 2008

*NOTARY PUBLIC*

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
DOROTHY A. WICKLIFF, Notary Public
City of Philadelphia, Phila. County
My Commission Expires June 19, 2010

26