Tom J. Ferber (tferber@pryorcashman.com)
Mark A. Tamoshunas (mtamoshunas@pryorcashman.com)
Jordan S. Paul (jpaul@pryorcashman.com) (*admission pending*)
PRYOR CASHMAN LLP
410 Park Avenue
New York, NY 10022

Attorneys for Defendant Lions Gate Films, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
ANTONNE M. JONES,

                           Plaintiff,            07 Civ. 3648 (KNF)

       -against-

ROC-A-FELLA FILMS, INC., LIONS GATE
FILMS, INC., DAMON DASH and
SHAWN CARTER,

                        Defendants.
--------------------------------------------------------------------X

**DEFENDANT LIONS GATE FILMS, INC.'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

MATERIAL, UNDISPUTED FACTS .................................................................. 2

ARGUMENT ....................................................................................................... 6

    I.     THERE IS NO SUBSTANTIAL SIMILARITY OF PROTECTIBLE
           EXPRESSION BETWEEN "THE FAMILY" AND *STATE PROPERTY* .......... 8

         A.    Many of the Alleged Similarities Are Non-Actionable
               Because Both Works Are Based on Actual Events ..................................... 9

         B.    Similarities in *Scenes A Faire* Are Not Actionable ................................. 14

         C.    The Plaintiff's Work and *State Property* Have Different
               Characters, Themes and a Different Total Concept and Feel .................... 17

         D.    The Plots, Sequence and Pace of the Two Works are Dissimilar ............. 19

         E.    Settings ................................................................................................. 21

         F.    Many of the Alleged Similarities Are Mischaracterized ......................... 21

    II.    ALL CLAIMS PERTAINING TO *STATE PROPERTY II* SHOULD BE
           DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE ANY
           SIMILARITIES BETWEEN *STATE PROPERTY II* AND "THE FAMILY" ... 23

    III.   PLAINTIFF'S LANHAM ACT CLAIMS FAIL AS A MATTER OF LAW .... 23

CONCLUSION .................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES                                                          PAGE(s)

Alexander v. Haley,
    460 F. Supp. 40 (S.D.N.Y. 1978) ...................................................................10, 13

American Direct Marketing, Inc. v. Azad International, Inc.,
    783 F. Supp. 84 (E.D.N.Y. 1992) .........................................................................15

Arden v. Columbia Pictures Industries,
    908 F. Supp. 1248 (S.D.N.Y. 1995).............................................................7, 15, 21

Armstrong v. Virgin Records, Ltd.,
    91 F. Supp. 2d 628 (S.D.N.Y. 2000)......................................................................24

Bevan v. Columbia Broadcasting System, Inc.,
    329 F. Supp. 601 (S.D.N.Y. 1971) .......................................................................17

Brown v. Perdue,
    No. 04 Civ. 7417 (GBD), 2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005),
    aff'd by, 177 Fed. Appx. 121 (2d Cir. 2006), cert. denied, 127 S. Ct. 580,
    166 L. Ed. 2d 457 (2006).   ................................................................7, 10, 15, 20

Carroll v. Kahn,
    No. 02-CV-0656, 2003 WL 22327299 (N.D.N.Y. Oct. 9, 2003) ..........................24

Christie v. Harris,
    47 F. Supp. 39 (S.D.N.Y. 1942), aff'd, 154 F.2d 827 (2d Cir. 1946)....................19

Conan Properties v. Mattel, Inc.,
    712 F. Supp. 353 (S.D.N.Y. 1989) .......................................................................15

Dastar Corp. v. Twentieth Century Fox Film Corp.,
    539 U.S. 23 (2003).........................................................................................23, 24

Green v. Lindsey,
    885 F. Supp. 469 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir. 1993)............16, 17

Historical Truth Prods., Inc. v. Sony Pictures, Entm't, Inc.,
    No. 93 Civ. 5529 (MBM), 1995 WL 693189 (S.D.N.Y. Nov. 22, 1995)..............15

Hoehling v. Universal City Studios, Inc.,
    618 F.2d 972 (2d Cir. 1980)................................................................8, 9, 10, 14

**CASES**                                                                          **PAGE(s)**

Hogan v. DC Comics,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999)................................................................ *passim*

Jones v. CBS,
    733 F. Supp. 748 (S.D.N.Y. 1990) .......................................................................18

Morris v. Wilson,
    189 F. Supp. 565 (S.D.N.Y. 1960), aff'd, 295 F.2d 36 (2d Cir. 1961)...................19

Nichols v. Universal Pictures Corp.,
    45 F.2d 119 (2d Cir. 1930).....................................................................................17

Polsby v. St. Martin's Press,
    No. 97 Civ. 690 (MBM), 1999 WL 225536 (S.D.N.Y. April 19, 1999),
    aff'd, 8 Fed. Appx. 90 (2d Cir. 2001) ....................................................................10

Reyher v. Children's Television Workshop,
    533 F.2d 87 (2d Cir. 1976)..........................................................................7, 15, 18

Smith v. Weinstein,
    578 F. Supp. 1297 (S.D.N.Y. 1984),
    aff'd w'out op., 738 F.2d 419 (2d Cir. 1984) ..................................................10, 17

Walker v. Time Life Films, Inc.,
    615 F. Supp. 430 (S.D.N.Y. 1985), aff'd, 784 F.2d 44 (2d Cir. 1986)...................15

Walker v. Time Life Films, Inc.,
    784 F.2d 44 (2d Cir. 1986)...............................................................................16, 17

Warner Brothers, Inc. v. American Broad. Cos.,
    720 F.2d 231 (2d Cir. 1983)..................................................................................17

Weber v. Geffen Records, Inc.,
    63 F. Supp. 2d 458 (S.D.N.Y. 1999)......................................................................24

Williams v. Crichton,
    84 F.3d 581 (2d Cir. 1996)................................................................... *passim*

Zambito v. Paramount Pictures Corp.,
    613 F. Supp. 1107 (E.D.N.Y.), aff'd w'out op., 788 F.2d 2 (2d Cir 1985) .......7, 17

**STATUTES**

17 U.S.C. § 504.......................................................................................................23

**NEWSPAPER ARTICLES**                                                    **PAGE(s)**

Kity Caparella, *JBM Its Rise to Power; Brash Young Men Rule Over Drug Trade,*
        Philadelphia Daily News, August 25, 1989 ...........................................................14

Kity Caparella, *Pair: We Bought Coke for JBM; They Testify*
        *About Almost Monthly Runs to Florida for Purchases,*
        Philadelphia Daily News, April 7, 1992 ...............................................................14

Sean Patrick Griffin, *Black Brothers, Inc.: The Violent Rise and Fall of the*
        *Philadelphia Black Mafia* (2005)...........................................................................13

**CONGRESSIONAL MATERIALS**

"Organized Crime: 25 Years After Valachi," Hearings Before the Permanent
        Subcommittee on Investigations of the Committee on Governmental
        Affairs, United States Senate, 100th Congress, Second Session, US
        Government Printing Office, Washington: 1988 ...................................................13

**OTHER**

The Bible, Psalm 128:2..............................................................................................14

### PRELIMINARY STATEMENT

Plaintiff Antonne Jones ("Plaintiff" or "Jones") alleges that defendants' film, *State Property*, which was written by a Philadelphia native and which was based on the activities of a well-known local drug gang, infringes the copyright in his book "The Family," which tells the life story of its protagonist from childhood through the formation and activities of his Philadelphia drug gang to his ultimate downfall. In support of his claim, Plaintiff (also a Philadelphia native) offers a list of alleged similarities between his book and defendants' film which include, *inter alia*: that the gang leader has a "right hand" man and someone who represents the gang's "muscle"; that both gangs have a "motto"; that in their pursuit of direct sources of drugs, both gangs purchase from Colombian suppliers; that the gang members wear diamond rings; that both works depict the gangs eliminating rivals and disloyal members; and that both works depict the bribing of local police. The alleged similarities upon which Plaintiff erroneously bases his claim of infringement, however, are not remotely sufficient to meet the well-established standards in the Second Circuit for *actionable* similarity, because they are taken from historical fact, concern unprotectible *scenes a faire* depicting elements standard to the genre, and/or concern basic unprotectible *ideas* which are given dissimilar *expression* in the two works. Accordingly, defendant Lions Gate Films respectfully submits that when the book and film at issue herein are examined in light of the extensive authorities in this Circuit dismissing copyright claims as a matter of law, many of which concerned far greater similarities than those involved here, summary judgment dismissing Plaintiff's claim should be granted. Plaintiff's Lanham Act and accounting claims are also precluded as a matter of law.

## MATERIAL, UNDISPUTED FACTS

The works at issue are before the Court. While more extensive summaries are included as Exhibits I and J to the Ferber Declaration, the works are briefly summarized below. The other material, undisputed facts upon which Lions Gate relies herein are set forth in the exhibits to the accompanying declaration of Tom J. Ferber[1] and Lions Gate's Local Rule 56.1 statement.

Plaintiff's book, "The Family," tells the story of Anthony, an individual who starts a gang with every intention of remaining non-violent despite the illicit nature of his business, but who is gradually drawn into an increasing spiral of violence. (Ferber Exh. F). While he resists becoming violent, the actions of others force Anthony and his gang to murder rival drug dealers as well as one of their own members. (Ferber Exh. F). Anthony gradually realizes the personal toll from dealing drugs as well as its negative effects on his relationship with his family and begins to search for a different life, but it is too late for him to get out, as he has unwittingly allowed two undercover agents to become close to his organization. (Ferber Exh. F). Anthony is arrested and eventually sentenced to death after one of his gang members turns on him. (Ferber Exh. F).

*State Property*, on the other hand, tells the story of Beans who, from the beginning of the story, is willing to use whatever violent means are necessary to make money for himself and his gang. (Ferber Exh. G). He is not content to play by the rules set by the established drug dealers and offers his competitors a stark choice: cut in his gang or die. Id. While Beans sees himself as a family man, this propensity for violence spills over into his personal

---

[1] Attached as Exhibits C through E to the Ferber Declaration, respectively, are relevant excerpted pages from the deposition transcripts of the material witnesses in this case: Plaintiff Antonne M. Jones, Ernest "Tron" Anderson and Michael Paseornek, which hereinafter will be respectively cited parenthetically as: "(Jones Tr. __; Anderson Tr. __ and Paseornek Tr. __)."

life. Id. After he threatens two other established drug dealers, they kidnap his girlfriend, kill

her friend and demand ransom from Beans. Id. While she is eventually released, her

exposure to violence changes her view of his lifestyle and she pushes him to stop his drug

dealing. Id. Beans, however, cannot leave his violent ways behind and tries to kill the men

who kidnapped her. Id. In the end, Beans' willingness to commit violence, even when it is

not necessary, leads to his undoing. Id. A small time drug dealer whom he had shot five

times for doing business with a rival dealer survives and becomes a witness against Beans.

Id. Beans is arrested and sentenced to life in prison.

 *State Property* is based on a screenplay entitled "Get Down or Lay Down; Junior

Black Mob" by Ernest "Tron" Anderson ("Anderson"), who wrote the screenplay "on spec."[2]

(Anderson Tr. at 79).  Anderson sold his screenplay to Roc-A-Fella, Inc. which, in turn,

entered into an agreement with Lions Gate for the film, which was eventually entitled *State

Property*.  (Paseornek Tr. at 10).  While Lions Gate distributed *State Property*, it had no

creative involvement in the making of the film.  (Paseornek Tr. at 34-35).

 Anderson based the screenplay for *State Property* on the Junior Black Mafia or

"JBM," an actual drug gang in Philadelphia with which he was very familiar, both from news

reports and from his own involvement in the drug trade.  (Anderson Tr. at 51-53, 79-80, 87-

89, 364-365).  Anderson, who, like Plaintiff, grew up in Philadelphia, was well aware of the

gang from living in the neighborhood.  (Anderson Tr. at 14; Jones Tr. at 9).

 Anderson first came up with the idea to write a screenplay based on the Junior Black

Mafia in 1993 after the success of the film *Menace II Society*, a film about a young drug

dealer's rise to power in the South Central neighborhood of Los Angeles.  (Anderson Tr. at

---

[2] "On spec" refers to a script written independently by a writer that is then shopped to prospective
producers as opposed to a script written pursuant to a contract with a particular producer or studio.

62-63).  The film reminded Anderson of many events from his own life in Philadelphia involving the Junior Black Mafia.  (Anderson Tr. at 62-63, 363-365).  At that time, however, he was discouraged from writing the screenplay because several members of that gang were still challenging their convictions on appeal and his associates advised against writing such a screenplay.  (Anderson Tr. at 62-64).

Anderson renewed his interest in the project in 1998, after speaking to a friend who expressed interest and thought he could help find financing for the project.  Anderson started writing a treatment setting forth his proposed story in July 1998.  (Anderson Tr. at 64-66).  Anderson also mentioned the project to Dash, with whom he was working on other projects, because Anderson thought Dash would be well suited to play one of the characters in the story he was writing.  (Anderson Tr. at 64, 66, 69-70, 72-75).  Dash was interested in the idea and asked that Anderson get him a script.  (Anderson Tr. at 72-73, 75-76).

Anderson finished the treatment, entitled *"Junior Black Mob,"* on September 17, 1998 and began writing the screenplay shortly thereafter.  (Anderson Tr. at 64-65, 76-77; Ferber Decl. Exh. K).  Anderson based both the treatment and screenplay for *State Property* on the real "JBM."  (Anderson Tr. at 51-53, 79-80, 87-89, 364-365).  Not only did he see television reports regarding the gang, he personally knew many of its members from his own time dealing drugs. (Anderson Tr. at 51-53, 55-57).  Moreover, most of the characters in *State Property* were based on actual members of the Junior Black Mafia: the characters known as "A.J.," "Baby Boy," and "D-nise" were each based on actual members of the JBM and the character "Boss" was based on one of the real-life rivals of the JBM.  (Anderson Tr. at 53-55, 59-61).

Many of the elements depicted in *State Property* are based on actual facts or events involving the Junior Black Mafia.  For example, the gang's motto in *State Property* --"Get down or lay down"-- was taken from the actual motto of the JBM (Anderson Tr. at 87; Ferber Exh. M).  Similarly, the scene where Baby Boy and D-nise travel to Florida from Philadelphia to purchase 10 kilograms of cocaine was based on an actual indictment of a JBM member, although the actual amounts of the purchases may have been inflated for dramatic purposes. (Anderson Tr. at 80-84, 86-87).  The treatment also provides that "JBM was set up like the military and divided into sections" (Ferber Exh. K at 2), which was based on Anderson's personal knowledge of members of JBM who headed up various geographic divisions. (Anderson Tr. at 79-80).

Upon completing the screenplay, entitled *Get Down or Lay Down; Junior Black Mob*, Anderson showed it to Dash, who agreed to shop the script, which was eventually purchased by Roc-A-Fella and made into the film *State Property*. (Anderson Tr. at 77-78, 95-96; Ferber Decl. Exhs. L and G).  While Plaintiff claims to have given Dash a copy of "The Family" (which he speculates Dash passed on to Anderson), Anderson never read it and was never told of its contents.  (Anderson Tr. at 107-109; Jones Tr. at 63-64).  In short, the evidence establishes that Anderson independently created the screenplay for *State Property*.[3]

Indeed, while Plaintiff bases his allegation of copying on the common connection to Dash, he knows that his conjectural allegations are contrary to the facts.  Anderson testified that Plaintiff has repeatedly asked him to submit a false affidavit to the Court stating that Dash gave him a copy of Plaintiff's book and instructed him to base a screenplay on it, even though Anderson told Plaintiff that he had *not* read the Plaintiff's work or used it in writing

---

[3] Anderson testified that, at the meeting where he gave Dash this screenplay, he observed a copy of "The Family" in Dash's office, but was not given a copy of it or told of its story and never read it.  (Anderson Tr. at 105-108).

his screenplay. (Anderson Tr. at 110-115). Anderson also testified that Plaintiff offered him five percent of any recovery he might obtain in this case in exchange for this affidavit. (Anderson Tr. at 111-113, 128-130, 132-133, 155-156, 167-169). In his efforts to persuade Anderson, Plaintiff also arranged through a friend for Anderson to receive a 60% discount on hotel rooms on many occasions and then had that benefit withheld after Anderson indicated that he would not perjure himself for Plaintiff. (Anderson Tr. at 129-132, 161-162, 192-194). Plaintiff also offered to hire Anderson to write a screenplay for him, which Anderson also understood to be conditioned on signing the false affidavit. (Anderson Tr. at 179-181, 197-198, 358-359). Anderson further testified that Plaintiff's counsel offered to represent him in a potential case against Dash and Roc-A-Fella, in which Anderson would seek allegedly unpaid "back end" compensation for *State Property*, if he cooperated by signing the proposed affidavit. (Anderson Tr. at 115-127). Finally, Anderson testified that, after he refused Plaintiff's offer, Plaintiff threatened him. (Anderson Tr. at 169-170, 195-196, 347-348).

Plaintiff's own deposition testimony displayed astonishing memory gaps regarding any facts that might prove inconvenient for him. While acknowledging that he had had some meetings with Anderson, Plaintiff claimed that he was unable to recall what, if anything, was said about the key issue in the case--whether Anderson admitted or denied having access to or copying any aspect of Plaintiff's work--despite the fact that he was still in regular contact with Anderson as part of his continuing effort to persuade him to sign the false affidavit. (Jones Tr. at 159-183).

## ARGUMENT

A copyright infringement plaintiff must satisfy three separate elements: (i) ownership of a valid copyright; (ii) access; and (iii) substantial similarity of copyrightable expression.

Arden v. Columbia Pictures Indus., 908 F. Supp. 1248, 1259 (S.D.N.Y. 1995). Despite the facts establishing Anderson's independent creation of the screenplay for *State Property*, this motion concerns only the third element - which is the heart and soul of any claim of infringement - which is addressed as a matter of law and obviates any need for the Court to address arguments concerning credibility.

The Second Circuit has long recognized that summary judgment is appropriate where "the similarity concerns only noncopyrightable elements of plaintiff work," or "no reasonable trier of fact could find the works substantially similar." Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (citations and quotations omitted); see also Hogan v. DC Comics, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999); Arden, 908 F. Supp. at 1259; Zambito v. Paramount Pictures Corp., 613 F. Supp. 1107, 1110 (E.D.N.Y.), aff'd w'out op., 788 F.2d 2 (2d Cir 1985); Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976).

Non-copyrightable elements should be disregarded in light of the Second Circuit's "discerning ordinary observer test," which is directed to whether an "average lay observer," properly instructed to ignore non-protectible elements, would find that "the protectible elements, standing alone, are substantially similar" in copyrightable expression. Hogan, 48 F. Supp. 2d at 309; accord Brown v. Perdue, No. 04 Civ. 7417 (GBD), 2005 WL 1863673, at *6 (S.D.N.Y. Aug. 4, 2005), aff'd by, 177 Fed. Appx. 121 (2d Cir. 2006), cert. denied, 127 S. Ct. 580, 166 L. Ed. 2d 457 (2006). Defendant moves for summary judgment only on the ground that there is no substantial similarity between "The Family" and *State Property* at the level of copyrightable expression, as opposed to unprotectible ideas, facts and *scenes a faire*.

**POINT I**
**THERE IS NO SUBSTANTIAL SIMILARITY OF PROTECTIBLE**
**EXPRESSION BETWEEN "THE FAMILY" AND *STATE PROPERTY***

"The Family" and *State Property* both revolve around the unprotectible idea of a drug

gang in Philadelphia. "It is a principle fundamental to copyright law that a copyright does

not protect an idea, but only the expression of an idea." Williams, 84 F.3d at 587

(recognizing that upon any work a great number of patterns of increasing generality will fit

equally well, but, as more details are left out, the closer the author comes to seeking

protection of his idea rather than his particular expression of that idea) (citations and

quotations omitted). Similarly, *scenes a faire,* "incidents, characters or settings which are as

a practical matter indispensable, or at least standard, in the treatment of a given topic," are

unprotectible as a matter of law. Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 979

(2d Cir. 1980) (citations and quotations omitted). Nor may a plaintiff prevent other parties

from creating works inspired by the same historical events. Id. at 978.

All of the similarities alleged by Plaintiff are at such a broad level of abstraction that

Plaintiff effectively seeks protection for the very idea of a story about an urban drug gang,

rather than his particular expression of this idea. Even at this generalized level of

abstraction, most of the similarities alleged by Plaintiff are taken out of context or

mischaracterized, so that they are not actually similar or the alleged similarity concerns

unprotectible *ideas* which are given dissimilar *expression*. To the extent there are any actual

similarities between the two works, they concern unprotectible *scenes a faire* that are

standard dramatic devices arising from the common, uncopyrightable idea of an urban drug

gang. Moreover, most of the alleged similarities, including many of the *scenes a faire*, are

based on actual events and facts concerning the actual Junior Black Mafia. Indeed, it is

entirely unremarkable that both Anderson and Plaintiff, having grown up in the same

neighborhood in Philadelphia at or around the time of JBM's height of power, would both

have written works inspired by this gang's prominence in Philadelphia and the local media.

**A.    Many of the Alleged Similarities Are Non-Actionable
Because Both Works Are Based on Actual Events**

State Property was based in large part on the well-known activities of Philadelphia's

infamous drug gang, the JBM, as indicated in the title of Anderson's screenplay.  Anderson

obtained information for the screenplay by reading an indictment of one of the members of

the JBM, and from conversations with individuals on the street, including a captain in the

JBM gang, as well as from television news reports.  (Anderson Tr. at 51-53, 79-80, 87-89,

364-365).  While Anderson filled in the details and created some events, the screenplay for

State Property was inspired in large part by actual historical events.  Id.

As the Second Circuit has explained:

> [t]he protection afforded the copyright holder has never extended to history, be it
> documented fact or explanatory hypothesis. The rationale for this doctrine is that the
> cause of knowledge is best served when history is the common property of all, and
> each generation remains free to draw upon the discoveries and insights of the past.
> **Accordingly, the scope of copyright in historical accounts is narrow indeed,
> embracing no more than the author's original expression of particular facts and
> theories already in the public domain. As the case before us illustrates, absent
> wholesale usurpation of another's expression, claims of copyright infringement
> where works of history are at issue are rarely successful**.
> Hoehling, 618 F.2d at 974 (emphases supplied).

Accordingly, the Second Circuit explained in Hoehling that where the "idea at issue is an

interpretation of a historical event, our cases hold that such interpretations are not

copyrightable as a matter of law." Id. at 978.  Indeed, "[t]o avoid a chilling effect on authors

who contemplate tackling an historical issue or event, broad latitude must be granted to

subsequent authors who make use of historical subject matter, including theories or plots."

Id. at 978 (holding that film and the book upon which it was based relating to the Hindenberg
disaster did not infringe appellant's book on same subject even though it was admittedly
consulted by author of purportedly infringing book).

Courts in this circuit have held that where "common sources exist for the alleged
similarities, or the material that is similar is otherwise not original with the plaintiff, there is
no infringement." Alexander v. Haley, 460 F. Supp. 40, 45 (S.D.N.Y. 1978) (citations
omitted)(holding that book "Roots" did not infringe plaintiff's work which also dealt with
fact and fiction relating to historical issue of black slavery); see also Brown v. Purdue, 2005
WL 1863673, at *8 (granting summary judgment, noting that ideas and themes common to
parties' works "find their origin in historical facts, events and figures, as well as pre-existing
works"); Smith v. Weinstein, 578 F. Supp. 1297 (S.D.N.Y. 1984), aff'd w'out op., 738 F.2d
419 (2d Cir. 1984) (holding there was no infringement despite use of prison rodeo as vehicle
by which both protagonists plan and execute their escape, where prison rodeo was
newsworthy event placed in public domain through several news articles). Moreover, a
plaintiff may not assert a claim for copyright infringement where the "story" claimed to be
infringed is based on historical facts where there is no verbatim copying and the manner of
expressing those historical facts is not substantially similar. Polsby v. St. Martin's Press, No.
97 Civ. 690 (MBM), 1999 WL 225536, at *4 (S.D.N.Y. April 19, 1999), aff'd, 8 Fed. Appx.
90 (2d Cir. 2001).

Most of the events depicted in *State Property* which Plaintiff claims are similar to
those which occur in "The Family" are based on actual events involving the Junior Black
Mafia. For example, the motto in *State Property*, "Get down or lay down," which Plaintiff
claims infringes the gang's motto "Be good or be gone" in "The Family," *was the actual*

*motto of the JBM!* (Anderson Tr. at 87; Ferber Exh. M, Exh. P at 11). Nor do the attempts

by the ABM gang in *State Property* to force rival dealers to work for it infringe on the efforts

of the gang in "The Family" to supply rival dealers. Indeed, as indicated by its motto, JBM

intended to force rival drug dealers to work for them or be killed:

> The ultra-violent JBM was known for its motto, **"Get down or lay down"—
> cooperate or be killed.** It followed through on that pledge all too often, to its
> ultimate demise.
> (Ferber Exh. N, <u>Black Brothers, Inc.</u> at p. 229 (emphasis supplied)).

Similarly, the claimed similarity depicting drug gangs traveling from Philadelphia to

Florida to purchase drugs from Columbians is derived from actual events involving the JBM.

(Ferber Exh. P at 11-12). It was well known that the JBM went to Miami for drug purchases

and that it obtained drugs from Columbians. Indeed, a news article reporting on the trial of

JBM members indicated that such trips were routine:

> Two witnesses said yesterday they traveled to Florida on behalf of Junior
> Black Mafia defendants almost monthly during 1986 and 1987 to get shipments of
> cocaine weighing from 22 to 220 pounds for citywide distribution.
> **Admitted JBM member David Baynham, 30, and JBM associate Malin
> Dwight Sutton, 34, testified that they had traveled to the Miami area with
> reputed JBM leader Bernard "Quadir" Fields, and with each other to make
> cocaine buys.**
>                                   \* \* \*
> Under direct examination by assistant U.S. Attorney Allison Burroughs, each
> witness testified and corroborated each other's testimony: **They carried hundreds of
> thousands of dollars in suitcases, met with cocaine suppliers and drove back to
> Philadelphia with shipments of cocaine weighing from 22 to more than 220
> pounds.**
> (Ferber Exh. O, Kity Caparella, *Pair: We Bought Coke for JBM; They Testify About
> Almost Monthly Runs to Florida for Purchases*, Philadelphia Daily News, April 7,
> 1992, at p. 1 (emphasis supplied)).

The JBM was also reported to have obtained cocaine from Columbian suppliers:

> Fancy cars, furs, jewelry, new homes and sometimes legitimate businesses
> made for a comfortable life—providing, of course, the drug money continued to flow.
> Demand began outstripping supply, so the JBM bosses began turning to
> additional sources: major wholesalers already doing business in Hispanic

neighborhoods east of Broad Street, and **Columbian traffickers who shipped huge quantities of cocaine to Philadelphia on consignment.** (Ferber Exh. M, Kity Caparella, *JBM Its Rise to Power; Brash Young Men Rule Over Drug Trade*, Philadelphia Daily News, August 25, 1989, at 4-5 (emphasis supplied)).

*State Property's* depiction of two gang members traveling to Florida from Philadelphia to pick up cocaine was based on an actual indictment of a member of the Junior Black Mafia. (Anderson Tr. at 80-84, 86-87). Thus, the common story element in the parties' works concerning the purchase of drugs from Columbian suppliers in Florida is not actionable.

Plaintiff claims that another similarity between the two works is that the gang members are given rings with the initials of the gang inscribed and the gangs are described as "enjoy[ing] the fruits of [their] labor." (Ferber Exh. A at ¶¶ 67-70, Exh. P at ¶¶ 4-15). While Plaintiff mischaracterizes this purported similarity (the diamond rings in *State Property* do not actually have the initials of the gang inscribed), the presence of such bejeweled rings is based on historical fact. The JBM gang was known for flaunting its wealth by, among other things, purchasing rings with the gang's initials:

> An OCU intelligence report critiqued the gang in 1988: "The JBM is a group of young black males deeply involved in drug traffic in the Philadelphia area, these members are flashy in their style and flaunt their profits, driving expensive cars mainly Mercedes and BMWs which are completely [customized] with gold trim, black windows, etc. They wear brightly colored jogging suits ... along with expensive jewelry." **They were especially known for their trademark, diamond-encrusted rings bearing the initials JBM.**
> (Ferber Exh. N, Sean Patrick Griffin, Black Brothers, Inc. *The Violent Rise and Fall of Philadelphia's Black Mafia* at p. 228 (2005)(emphasis supplied)).

(See also Ferber Exh. Q, "Organized Crime: 25 Years After Valachi," Hearings Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs,

United States Senate, 100th Congress, Second Session, US Government Printing Office,

Washington: 1988, at 623-659 at 643.)[4]

The JBM also invested its drug proceeds in legitimate businesses, including

automobile detailing shops, as explained by a 1989 article in the Philadelphia Daily News,

which undermines another alleged similarity to an element Plaintiff improperly claims

(Ferber Exh. P at 18) to be his own copyrightable expression (although, as discussed below,

this element is not actually similar in the two works):

> \* The JBM has infiltrated or obtained a financial interest in at least 33 businesses.
>
> These include delicatessens, video stores, clothing stores, **automobile detailing shops**, security firms and car washes throughout the city.
>
> **JBM leaders use these businesses to launder money and provide legitimate fronts for their operations, authorities believe.**
> (Ferber Exh. M, Kity Caparella, *JBM Its Rise to Power; Brash Young Men Rule Over Drug Trade*, Philadelphia Daily News, August 25, 1989, at p. 2 (emphasis supplied)).

Plaintiff's claim that both works similarly depict the gang's killing one of its own

members who is perceived to be a "weak link" after he has become greedy and therefore

disloyal, aside from concerning an unprotectible *scene a faire*, is again based on actual events

involving the JBM.[5]  (Ferber Exh. P at 17).  The dissension within the JBM gang itself was

widely reported.  One such article stated:

> This generally low-key approach to empire building [by the JBM] lasted for nearly two years.

---

[4] Nor is the fact that the rings were purportedly purchased from a "Jewish" jeweler in both works significant or protectible.  In *State Property*, the individual who sells the ring is a cameo by Jacob Arabo p/k/a "Jacob the Jeweler," a well-known jeweler in real life in the hip-hop community who is known for selling unique diamond rings to affluent crime figures, music stars (particularly in the hip hop community) and other celebrities.  Ferber Dec. Exh. R.

[5] Nor does the Copyright Act afford protection to clichéd words or metaphors such as "weak link" or "fruits of our labor," a hackneyed phrase which has its origins in Psalm 128:2 of the Bible.  Ferber Exh. S ("You will eat the fruit of your labor; blessings and prosperity will be yours.");  Alexander, 460 F. Supp. at 45 (holding that the clichés, metaphors, common phrases and expressions are unprotectible).

Then, about 16 months ago, violent disputes erupted among JBM factions. One faction issued a nine-name hit list, and some members began wearing bulletproof vests.

Many of the shootings --at least 25 murders since April 1988-- were over drug debts, some as small as $600.

**Dealers suspected of skimming profits, such as JBM lieutenant Reginald Rittenberg, were killed, street sources said.** Rittenberg, 29, was said to be pocketing $1,500 from every kilo of cocaine he was moving in his Mount Airy neighborhood.

**JBM dealers who wanted to become independent, such as Albert Ragan, who broke away to avoid the street tax, were gunned down.** (Ferber Exh. M, Kity Caparella, *JBM Its Rise to Power; Brash Young Men Rule Over Drug Trade*, Philadelphia Daily News, August 25, 1989, at p. 5 (emphasis supplied).)

The claim that the works both similarly divide various neighborhoods of Philadelphia between gang members in order to "take over" the city is again rooted in historical fact. (Ferber Exh. P at 14). Anderson's treatment for *State Property*, entitled *Junior Black Mob*, provides that "JBM was set up like the military and divided into sections" based on Anderson's personal knowledge of members of JBM that headed the West or Southwest Philadelphia Division, the North and South Philadelphia divisions and the Mount Airy division of the JBM. (Anderson Tr. at 79-80).

A review of the claimed similarities demonstrates that the works are not substantially similar in copyrightable expression, only that they both may have incorporated certain unprotectible ideas and elements based on the actual Junior Black Mafia. Plaintiff, however, cannot bar any other works written about the JBM gang (or urban drug gangs in general) by claiming infringement of elements in his work that are clearly historically based.

**B.     Similarities in *Scenes A Faire* Are Not Actionable**

*Scenes a faire*, which are "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" do not enjoy copyright protection. Hoehling, 618 F. 2d at 979 (citation and quotations omitted); accord

Walker v. Time Life Films, Inc., 615 F. Supp. 430, 436 (S.D.N.Y. 1985), aff'd, 784 F.2d 44
(2d Cir. 1986); Reyher, 533 F.2d at 91; Arden, 908 F. Supp. at 1260; Brown, 2005 WL
1863673, at *7 ("[A]lthough both novels discuss the Catholic Church, such discussion is
expected from a thriller with religious themes and is an unprotectible *scene a faire*....
Similarly, ... that both novels discuss Swiss bank accounts and gold keys or that the novels
begin with a murder are unprotectible *scenes a faire*.").

The other similarities claimed by Plaintiff concern nothing more than general
elements common to the genre of drug gang films. (Ferber Exh. P at 8-18). Elements such
as seeking a purer source of cocaine from another supplier, attempting to cut out the middle
man in the drug supply chain, killing a disloyal gang member and killing rival drug dealers
are all elements common to the genre and appear repeatedly in drug gang films, such as *New
Jack City* (one of the most popular urban drug gang films, which starred Wesley Snipes) and
*Scarface* (both the original and the 1983 remake with Al Pacino), to name just two examples.
See Historical Truth Prods., Inc. v. Sony Pictures, Entm't, Inc., No. 93 Civ. 5529 (MBM),
1995 WL 693189 at *8 (S.D.N.Y. Nov. 22, 1995)("conspiracies, characters with superhuman
qualities and advanced technology" are "unoriginal and uncopyrightable stock elements of
the action-adventure and science fiction film genres"); see also American Direct Mktg., Inc.
v. Azad Int'l, Inc., 783 F. Supp. 84, 95 (E.D.N.Y. 1992)("Material or themes commonly
repeated in a certain genre are not protectible by copyright."); Conan Props. v. Mattel, Inc.,
712 F. Supp. 353, 359 (S.D.N.Y. 1989)(same). Indeed, **Plaintiff himself described his
work as being like "*New Jack City* with a *Goodfellas* narrative"** in an interview posted on
his own website. (Ferber Exh. T). For the Court's convenience, Lions Gate has submitted an
exhibit of excerpts from many such gang films demonstrating that the similarities claimed by

Plaintiff are either unprotectible *scenes a faire* commonly found in the genre or constitute factual matter, as seen in biographies on actual gangsters. (Ferber Exh. U).

There simply is no actionable similarity between the parties' works. Given the common, unprotectible idea of a story about an urban drug gang, there will necessarily be certain similar plot elements—including, *inter alia*, violence, seeking "purer" drugs, eliminating disloyal gang members, trying to maximize profit by cutting out a "middle man," and a "moll" who presents a personal conflict for the gang leader. Moreover, to the extent that these elements appear as uncopyrightable *ideas* in both works, the detailed, protectible *expression* which they are given in the two works is markedly different. (See Point F, *infra*.).

Courts in this circuit have routinely dismissed copyright infringement claims as a matter of law on precisely such grounds even where the works were far more similar than the subject works in this case. See, e.g., Walker v. Time Life Films, Inc., 784 F.2d 44, 49 (2d Cir. 1986) (elements such as drunks, prostitutes, vermin and derelict cars are *scenes a faire* in any work about policemen in South Bronx and "stock" themes linked to this genre, such as morale problems of policeman and familiar figure of Irish cop, are not copyrightable in case involving film *Fort Apache: The Bronx*); Williams, 84 F.3d at 589 (holding that setting of dinosaur adventure park with electric fences, automated tours, dinosaur nurseries and uniformed workers are all *scenes a faire* that flow from uncopyrightable concept of dinosaur zoo); Hogan, 48 F. Supp. 2d at 310-311 (holding that unprotectible idea of half-vampire character searching for his origins leads to unprotectible scenes and themes flowing from this idea such as character's sinister genealogy, character's dual nature and struggle between good and evil, and use of flashback or memory to portray events from character's past); Green v. Lindsey, 885 F. Supp. 469, 482-488 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir.

1993) (two "high-tech bodice ripper" novels, *The Warrior Within* and *Warrior's Woman*, depicting futuristic women enslaved by barbarian captors, not substantially similar in copyrightable expression); <u>Zambito</u>, 613 F. Supp. 1107 (holding that "Raiders of the Lost Ark" does not infringe on plaintiff's work involving archeologist who has treasure stolen by German antagonists and noting that treasure hidden in cave with snakes, use of fire to repel snakes, that birds might frighten intruder in jungle or that weary traveler might seek solace in tavern are all unprotectible *scenes a faire*); <u>Bevan v. Columbia Broad. Sys., Inc.</u>, 329 F. Supp. 601 (S.D.N.Y. 1971) (granting j.n.o.v., holding that television show "Hogan's Heroes" does not infringe plaintiff's play involving prisoners in German prisoner of war camp).

Similarities between two stories about thugs rising from city streets to become brutal drug dealers are as unremarkable, and as non-actionable, as the similarities between two stories about police stations in the South Bronx in <u>Walker</u>, dinosaur adventure parks in <u>Williams</u>, the premise of a half-vampire in <u>Hogan</u>, the "high-tech bodice rippers" in <u>Green</u>, treasure-hunting archaeologists pursued by German antagonists in <u>Zambito</u>, or American POWs in WWII German stalags in <u>Bevan</u>, all of which were rejected as a matter of law by their respective courts.

**C.      The Plaintiff's Work and *State Property* Have Different
<u>Characters, Themes and a Different Total Concept and Feel</u>**

Basic character types that merely "stirring one's memory of a copyrighted character..." do not trigger liability for infringement. <u>E.g.</u>, <u>Warner Bros., Inc. v. American Broad. Cos.</u>, 720 F.2d 231, 242 (2d Cir. 1983); <u>Smith</u>, 578 F. Supp. at 1303; <u>Nichols v. Universal Pictures Corp.</u>, 45 F.2d 119, 121 (2d Cir. 1930). In comparing two works, the Court must also determine whether the alleged similarities are something more than "'mere generalized ideas or themes.'" <u>Hogan</u>, 48 F. Supp. 2d at 309, <u>quoting</u> <u>Walker</u>, 784 F.2d at

48-49. <u>See generally</u> <u>Jones v. CBS</u>, 733 F. Supp. 748, 754 (S.D.N.Y. 1990) ("basic plot ideas" not protectible). This requires a consideration of whether the works "share a similarity of expression, such as 'similarities of treatment, details, scenes, events and characterization,' or a similarity in their 'total concept and feel.'" <u>Id.</u>, <u>citing</u> <u>Reyher</u>, 533 F.2d at 91, <u>Williams</u>, 84 F.3d at 589, n.3.

 Here, Plaintiff has not even alleged similarities between the characters of the two works either in his deposition testimony or in his responses to interrogatories. (Ferber Exh. P at 8-18; Jones Tr. at 187-227). Indeed, the two main characters—Anthony and Beans—who are at the very heart of their respective stories, are very different. Anthony is conflicted by his chosen lifestyle and, at least on some level, seeks to avoid violence and struggles to improve his relationship with his girlfriend despite his infidelity. Beans, on the other hand, is a violent sociopath who feels no remorse or pangs of conscience for the violence he inflicts on rival drug dealers or on his own gang. The other gang members in *State Property* are not very developed and, to the extent they are, bear little similarity to those in "The Family." Finally, while "The Family" focuses in large part on his girlfriend Lauryn and his mistress Kimmy, these characters are not similar to any in *State Property*.

 The dissimilarities in the protagonists at the heart of each story results in a markedly different concept and feel of the two works. "The Family" by focusing on Anthony's initial intention to remain nonviolent, deals extensively with both his inability to avoid violence after choosing to sell drugs, as well as the emotional fallout from the acts of violence he is forced to commit. "The Family" also focuses at length on the personal costs from the drug dealing lifestyle, which Anthony believes leads to his infidelity and damages his relationship with his wife. In contrast, *State Property* focuses on Beans, who unhesitatingly embraces

violence, both to eliminate rival drug dealers or to coerce their cooperation and as a means to maintain order within his own gang. Beans utilizes violence throughout the film without doubt or remorse, and the film has little of the self-examination which is a prominent feature of Plaintiff's book.

**D.     The Plots, Sequence and Pace of the Two Works are Dissimilar**

As set forth at length in the actual works and the summaries of those works, the plots, sequence and pace of the two works are markedly different. In an attempt to avoid these dissimilarities, Plaintiff's Complaint relies on a list of purported similarities taken out of context. (Ferber Exh. A, at ¶¶ 47 to 86).

As an initial matter, such lists are disfavored as "'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works,'" and have been held to be insufficient to defeat summary judgment. Williams, 84 F.3d at 590 (citations omitted); accord Morris v. Wilson, 189 F. Supp. 565, 567-68 (S.D.N.Y. 1960), aff'd, 295 F.2d 36 (2d Cir. 1961) (stating that "similarities" in 371-page list were "strained, forced or nonexistent"); Christie v. Harris, 47 F. Supp. 39, 40-41 (S.D.N.Y. 1942), aff'd, 154 F.2d 827 (2d Cir. 1946) (186-page analysis of "similarities" attributed to "plaintiff's ingenuity rather than an actual reflection of reality") (citations omitted).

The reason that such lists are disfavored is clear here since Plaintiff's list fails to take into account the notable dissimilarity in plot in the two works. *State Property* takes place over what appears to be a two year period and focuses almost exclusively on Beans' violent attempts to take over rival gangs and their retaliations. After killing many rival drug dealers or coercing them to do business with ABM, Beans faces conflict with two more established drug dealers, Boss Dame and Untouchable J. After being threatened by Beans, these dealers

kidnap Beans' girlfriend, Iesha, kill her friend and demand ransom. Beans pays the ransom and gets back Iesha, who then asks that he abandon his gang lifestyle. Beans, however, unsuccessfully attempts to kill the men who kidnapped her. Beans is eventually arrested after one of his rival dealers survives Beans' attempt to kill him. After an imaginary shoot-out in the courthouse, Beans reveals that he was sentenced to life in prison.

"The Family," on the other hand, starts by detailing Anthony's childhood and the next ten years or so as Anthony shifts from a disciplined, studious teenager who starts dabbling in drug dealing only to gradually find himself ensnared in a lifestyle which forces him to commit acts of violence and which damages his personal relationships. Rather than focusing on the violent acts committed by the gang, "The Family" primarily details the gang's attempts to expand non-violently and the eventual infiltration of the gang by undercover federal agents. The book also focuses extensively on the personal relationship between Anthony and his mistress and how that affects his relationship with his girlfriend—elements which are not present in *State Property*.

The actual plots of the two works are thus very different despite the isolated similarities which Plaintiff seeks to take out of context. Moreover, the pace of the two works is very different as the story of "The Family" takes place over a period of more than 10 years, while the events in *State Property* appear to occur over a couple of years. Such a difference in pace has been held to constitute a dissimilarity in expression. See Brown, 2005 WL 1863673, at *12-13 (holding the pace of two works is substantially different where one takes place over matter of days as compared to many months).

**E.     Settings**

The settings in the two works are not similar beyond the fact that some of the events in both works take place in Philadelphia with a trip to Florida. As noted above, these settings were chosen because the JBM gang was actually based in Philadelphia and had made trips to Florida to purchase drugs. The use of such settings is not protectible. See Williams, 84 F.3d at 589 (holding that similarities in setting were not protectible since they flowed from "uncopyrightable concept of a dinosaur zoo"); see also Arden, 908 F. Supp. at 1262 (holding that similarity of settings due to use of restaurant and employment settings "is far too general to be the basis of a copyright infringement action"). In any event, while *State Property* appears to be set in modern day with the latest music and clothes displayed, "The Family" is set primarily from the mid-1980s to the early 1990s. Many of the events in "The Family" also take place in locations not present at all in *State Property*, such as New York, Atlantic City and Puerto Rico.

**F.     Many of the Alleged Similarities Are Mischaracterized**

Many of the other alleged similarities are simply mischaracterized and are actually *dissimilar* when examined in context.

For example, Plaintiff claims the use of "stash houses" in the two works constitutes an actionable similarity. (Ferber Exh. P at 16). However, in *State Property*, Beans and his gang are the perpetrators of violence and rob rival drug dealers of their cash and money. (Ferber Exh. G). In "The Family," Anthony and his gang have drugs stolen from their "stash houses," and are therefore the victims of attacks by a rival dealer. (Ferber Exh. F). The purported similarity in using a woman to set up a rival drug dealer similarly attempts to gloss over the substantial differences in the women's roles. (Ferber Exh. P at 16). In "The

Family," Anthony uses his mistress Kimmy to distract a rival drug dealer prior to having him killed by members of the Los Angeles gang the Crips. (Ferber Exh. F). In *State Property*, one of the members of the ABM gang seduces the rival drug dealer's girlfriend and gets her to turn on her boyfriend to set him up to be killed. (Ferber Exh. G). The woman thus has no connection to the gang leader, who then seizes this opportunity to have the ABM gang member killed as well by having the police show up at the time of the planned murder. (Ferber Exh. G). When examined in context, there are no similarities in these elements.

Plaintiff also claims that the use of automobile detailing shops is similar in both of the works. (Ferber Exh. P at 18). Again, however, this is simply a mischaracterization. In "The Family," Anthony purchases a number of detailing shops in Philadelphia and other cities in order to launder money and establish community support through legitimate businesses, just as the JBM did. (Ferber Exh. F). In contrast, a rival drug dealer in *State Property* appears to own what looks like an automobile parts store, which is nothing more than the setting for a confrontation between Beans and that rival drug dealer. (Ferber Exh. G).

Plaintiff also claims that the works are substantially similar in that in *State Property*, Beans wants to make money selling drugs so he can afford his own apartment and be able to be intimate with his girlfriend and in "The Family," after she gets pregnant, Lauryn tells Anthony that she will need to move out of her parent's house. (Ferber Exh. P at 15). Again, when examined in context, these scenes are actually dissimilar. In one, the protagonist wants his own home to satisfy his own needs and in the other it is the love interest pressing for a new home after she becomes pregnant.

Nor is there any merit to Plaintiff's claims that the gangs are similar because they both have four members. (Ferber Exh. A at ¶¶ 49-50, Exh. P at 9-10; Jones Tr. at 189).

While the gang in "The Family" initially had four members, the ABM gang in *State Property* has more than that, although the precise number appears to vary.  (Ferber Exh. F).  The initial title scene shows a gang with five members and the number of individuals in the gang varies from four to as many as nine members.[6]

## POINT II
### ALL CLAIMS PERTAINING TO *STATE PROPERTY II* SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE ANY SIMILARITIES BETWEEN *STATE PROPERTY II* AND "THE FAMILY"

Where there are no substantial similarities between the copyrightable elements of the Plaintiff's work and the Defendant's work, there can be no copyright infringement. Williams, 84 F.3d at 588-90; Hogan, 48 F. Supp. 2d at 308-11.

Here, there are no similarities between "The Family" and *State Property II*, much less substantial similarities of protectible expression.  Indeed, Plaintiff alleges no similarities between *State Property II* and "The Family" in his Complaint (id.), and could offer no alleged similarities between the two works when specifically required to do so.  (Ferber Exh. P at 8-18; see also Jones Tr. at 187-227).  The record is devoid of any actual or alleged similarities between these two works, and consequently, all claims concerning *State Property II* should be dismissed.

## POINT III
### PLAINTIFF'S LANHAM ACT CLAIMS FAIL AS A MATTER OF LAW

Plaintiff's reverse passing off claim under the Lanham Act, which merely recasts his copyright infringement claim, fails as a matter of law.  See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003).  In Dastar, the Supreme Court held that the

---

[6] Not only should the Plaintiff's copyright claim be dismissed for all of the foregoing reasons, the claim for an accounting under 17 U.S.C. § 504 also fails as a matter of law (or is preempted under 17 U.S.C. § 301). Plaintiff's claim for an accounting does not provide him with an independent basis for recovery and it has no applicability where he cannot demonstrate substantial similarity of copyrightable expression.

phrase "origin of goods" in § 43(a) of the Lanham Act does <u>not</u> refer to the person or entity

who originated the ideas or intellectual property embodied within the "goods," but rather

refers to the producer of the tangible product itself. <u>Id.</u> at 31.  <u>See also Carroll v. Kahn</u>, No.

03-CV-0656, 2003 WL 22327299 (N.D.N.Y. Oct. 9, 2003) (holding that "Lanham Act claim

based on Defendants' alleged failure to give Plaintiff proper credit as author ... is foreclosed

by <u>Dastar</u>").  Thus Plaintiff, who merely claims to be the source of "origin" of certain ideas

and expression contained within Defendants' film (<i>i.e.</i>, the "goods"), may not bring a claim

under section 43(a).  Plaintiff's Lanham Act claim also fails as a matter of law because it

merely duplicates his copyright claim.  <u>See, e.g.</u>, <u>Weber v. Geffen Records, Inc.</u>, 63 F. Supp.

2d 458 (S.D.N.Y. 1999) (dismissing Lanham Act claim where Plaintiff attempted to convert

copyright claim to Lanham Act violation); <u>see also Armstrong v. Virgin Records, Ltd.</u>, 91 F.

Supp. 2d 628, 633 (S.D.N.Y. 2000) (same).

Here, Plaintiff's Lanham Act claim is precluded by <u>Dastar</u>.  Plaintiff, an author of a

literary work, asserts a Lanham Act violation based on the same acts alleged in support of his

copyright infringement action.  Indeed, when asked in interrogatories to provide facts

supporting his Lanham Act claim, Plaintiff simply referred back to the same facts alleged in

support of his copyright infringement claim.  (Ferber Exh. P at 22-23).  Underscoring the

duplicative nature of this claim is Plaintiff's Fourth Cause of Action, which seeks an

accounting of profits under the Lanham Act <u>identical</u> to the accounting sought in his

copyright infringement claim.  Plaintiff's attempt to recast his copyright claim as a Lanham

Act violation is a thinly veiled attempt to create the exact species of "mutant" copyright law

rejected by the Supreme Court in <u>Dastar</u>.  Accordingly, Plaintiff's Lanham Act claim and the

related accounting claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant Lions Gate Films, Inc. respectfully requests that the Court grant its motion for summary judgment, dismiss the Complaint in its entirety, with prejudice, together with such other and further relief the Court deems just and proper.

Dated: New York, New York
       April 15, 2008

PRYOR CASHMAN LLP

By:

Tom J. Ferber (tferber@pryorcashman.com)
Mark A. Tamoshunas (mtamoshunas@pryorcashman.com)
Jordan S. Paul (jpaul@pryorcashman.com) (*admission pending*)
       410 Park Avenue
       New York, New York  10022
       (212) 421-4100

*Attorneys for Defendant Lions Gate Films, Inc.*