Victor A. Dunlop (moreno@sundree.tv)
DUNLOP & ASSOCIATES, P.C.
55 Washington Street, Suite 451
Brooklyn, New York 11201
718.403.9261 Telephone
614.455.9261 Facsimile

Ambrose W. Wotorson (loaww1650@aol.com)
LAW OFFICE OF AMBROSE W. WOTORSON
26 Court Street, Suite 1811
Brooklyn, New York 11201
718.797.4861 Telephone
718.797.4863 Facsimile

Attorneys for Plaintiff Antonne M. Jones

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ANTONNE M. JONES,                                  :
                                                   :
                    Plaintiff,                     :
                                                   :
          -against-                                :          **07 Civ. 3648 (KNF)**
                                                   :
ROC-A-FELLA FILMS, INC., LIONS GATE                :
FILMS, INC., DAMON DASH and                        :
SHAWN CARTER,                                       :
                                                   :
                    Defendants.                    :
------------------------------------------------------------X


### PLAINTIFF ANTONNE M. JONES' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' LIONS GATE FILMS, INC., DAMON DASH AND ROC-A-FELLA FILMS, INC. MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                     <u>**PAGE #**</u>

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct.
2505, 91 L.Ed. 202 (1986)……………………………………………….…9

Arica Inst. v. Palmer, 970 F.2d 1067, 1072 (2d Cir. 1992)………………23

Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946)…………………………10

Bender v. West Publ. Co., 158 F.3d 693 (2nd Cir. 1998)…………………10

Boisson v. Banian, Ltd., 273 F.3d 262, 270 (2d Cir. 2001)……………...15, 17, 19

Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,
 150 F.3d 132, 137 (2d Cir. 1998))………………………………………10

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. ED.
2D 265, 106 S.Ct. 2548 (1986)…………………………………………….9

D'Amico v. City of New York, 132 F.3d 145, 148 (2d Cir. 1998),
cert denied, 141 L.Ed.2 151, 118 S.Ct. 2075 (1998)……………………...9

Feist Publishing, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111
S.Ct. 1282, 113 L.Ed. 2d 358 (1991)…………………………………..10

Fisher Price, Inc. v. Well Made Toy Mfg. Corp., 25 F.3d 119
(2d Cir. 1994). ……………………………………………………...10, 22

Flaherty v. Filardi, 388 F.Supp2d 274 (S.D.N.Y. 2005)…………………11

Folio Impressions, Inc. v. Byer Cal., 937 F.2d 759, 765
(2d Cir. 1991)……………………………………………………………15, 17, 19, 23

Gund, Inc. v. Applause, Inc., 809 F.Supp 304, 308 (S.D.N.Y. 1993)……23

Historical Truth Products, Inc. v. Sony Pictures Entertainment,
1995 WL 693189…………………………………………………………10

Hoeling v. Universal City Studios, Inc., 618 F.2d 972 (2d Cir. 1980).......10, 23

Hogan v DC Comics, 48 F.Supp 2d 298 (S.D.N.Y. 1999)……………….10

Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). ………..........9

Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir. 1966)…….11, 23

Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003)………..10

Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139-140 (2d Cir. 1992)…10, 22

3 Nimmer on Copyrights §13.03[D] at 13-77…………………………..10

Price v. Fox Ent't Group, Inc., 2007 WL 241389 (SDNY 2007)………....15, 17, 19

Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 75 (2d Cir. 1997)…..11

Rogers v. Koons, 960 F. 2d 301, 308 (2d Cir. 1992)…………………………11

Warner Brothers, Inc. v. American Broadcasting Companies,
720 F.2d 231 (2d Cir. 1983)…………………………………………………..9

Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996)………………………11

## **STATUTES**

**CITATION**                                                          **PAGE #**

17 U.S.C. §410(c)……………………………………………………..10

17 U.S.C. § 501……………………………………………………..10

Victor A. Dunlop (VAD-8571)
DUNLOP & ASSOCIATES, P.C.
55 Washington Street, Suite 451
Brooklyn, New York 11201
718.403.9261 Telephone
614.455.9261 Facsimile

Ambrose W. Wotorson, Jr. (AWW-2412)
LAW OFFICE OF AMBROSE W. WOTORSON
26 Court Street, Suite 1811
Brooklyn, New York 11201
718.797.4861 Telephone
718.797.4863 Facsimile

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANTONNE M. JONES,                              :
                                               :
                  Plaintiff,                   :
                                               :
         -against-                             :    **07 Civ. 3648 (KNF)(HBP)**
                                               :    <u>PLAINTIFF'S MEMORANDUM</u>
                                               :    <u>OF LAW IN OPPOSITION TO</u>
                                               :    <u>DEFENDANTS' MOTIONS</u>
                                               :    <u>SUMMARY JUDGMENT</u>
                                               :
ROC-A-FELLA FILMS, INC., LIONS GATE            :
FILMS, INC., DAMON DASH and                    :
SHAWN CARTER,                                  :
                                               :
                  Defendants.                  :
------------------------------------------------------------X

## <u>PRELIMINARY STATEMENT</u>

        Plaintiff, Antonne M. Jones ("Plaintiff" or "Jones"),  by his attorneys, submit the instant

Memorandum of Law in Opposition to Defendants', Damon Dash, Roc-A-Fella Films and

Lionsgate Films, Inc., Motions for Summary Judgment. For the reasons that follow, defendants'

motions for summary judgment should be denied, as there are numerous issues of material fact

that can only be resolved by neutral fact-finders.

1

## STATEMENT OF FACTS

Defendants contend that they are entitled to summary judgment because there are no genuine issues of material fact. Defendants' arguments are wholly without merit, as the record clearly supports reasonable inferences of copyright infringement.

In any event, the relevant facts that are in dispute in this case are as follows:

Plaintiff is the author of *The Family- A Philadelphia Mob Story* (*"The Family")*, which is the subject of the above-captioned action currently pending in the United States District Court, Southern District of New York, 07 cv 3648. (Jones Affidavit, at Paragraph "2").

Plaintiff registered *The Family* for copyright protection with the United States Copyright Office and was granted Copyright Registration Number TXu 843-826, which was issued on July 2, 1998. (Jones Affidavit, at Paragraph "3"). *The Family* was first published and commercially released in or about August 1999. (Jones Affidavit, at Paragraph "4"). Plaintiff continued to sell and derive revenue from sales of T*he Family* and has enjoyed a certain level of critical acclaim for *The Family*, as well as, professional accolades, such as *The Family* making the August 2001 Essence "Best Seller" list and Hip Hop Magazine's "Book of the Month." (Jones Affidavit, at Paragraph "5").

Plaintiff was interested in adapting *The Family* into a film and therefore, contacted several individuals and media outlets, in an attempt to reach this goal. (Jones Affidavit, at Paragraph "6").

One of the individuals plaintiff called was Damon Dash at Roc-A-Fella Records in or about July 1998. (Jones Affidavit, at Paragraph "7").

Plaintiff spoke with Dash's then assistant, Carline Balan and advised her that he would like to meet with Dash to discuss his novel, *The Family*, and the possibility of adapting it into a film. (Jones Affidavit, at Paragraph "8").

Approximately a week or two later, Ms. Balan returned plaintiff's call and advised him that Dash was interested in meeting with plaintiff. (Jones Affidavit, at Paragraph "9").

Plaintiff traveled from Philadelphia to New York with Ronald Welton, to meet Dash in his office where they discussed the synopsis of *The Family* and the possibility of creating a film based on its contents (the "1st Meeting"). (Jones Affidavit, at Paragraph "10"). During the 1st Meeting, plaintiff presented Dash with two copies of the manuscript of *The Family* and a

projected budget for creating the film, as well as, sales projections for such a project. (Jones Affidavit, at Paragraph "11"). The manuscript had on its cover, puppet-strings and the words "The Family." There was no photograph of plaintiff on the cover. (Affirmation, Exhibit "10").

At the conclusion of the 1st Meeting, Dash told plaintiff that he was interested, he would take the book and that he would get back to him. (Jones Affidavit, at Paragraph "12"). Shortly after the 1st Meeting, both Ms. Balan and Dash called plaintiff to inform him that Dash wanted a second meeting (the "2nd Meeting"). (Jones Affidavit, at Paragraph "13"). Present at the 2nd Meeting in addition to plaintiff and Welton, were Mr. Dash, Shawn Carter, Kareem "Biggs" Burke, Carline Balan and Kyambo "Hip Hop" Joshua. (Jones Affidavit, at Paragraph "14").

During the 2nd Meeting, Dash told plaintiff that he had read *The Family* and asked whether the story was real. (Jones Affidavit, at Paragraph "15").

Plaintiff told Mr. Dash that the story was fictitious, and they began discussing Dash's acquiring of the film rights to *The Family*. (Jones Affidavit, at Paragraph "16").

Dash and plaintiff briefly negotiated an acquisition fee, wherein plaintiff requested $500,000 for the film rights to *The Family*. (Jones Affidavit, at Paragraph "17").

Mr. Carter advised plaintiff that they did not have that type of money, and Mr. Dash countered with $50,000. However, the parties could not reach an agreement. (Jones Affidavit, at Paragraph "18").

Mr. Dash told plaintiff that they could "work it out." (Jones Affidavit, at Paragraph "19"). The conclusion of the 2nd Meeting was the last time that plaintiff spoke with Mr. Dash concerning *The Family,* until his deposition in this case on December 20, 2007. (Jones Affidavit, at Paragraph "20").

*The Family* was published in August 1999, approximately one (1) year after the aforementioned Meetings. (Jones Affidavit, at Paragraph "21"). Plaintiff appears on the cover of the published book. In or about January 2002, the defendant's film *State Property* was theatrically released in the United States. However, plaintiff did not attend a theatre showing. (Jones Affidavit, at Paragraph "22").

In or about 2006, several individuals that read *The Family* and saw *State Property* asked Jones whether the movie was based on his book. (Jones Affidavit, at Paragraph "23").

Damon Dash, CEO of Roc-A-Fella Films, admitted in his deposition to having an off-the-record conversation with plaintiff after plaintiff's deposition when he was still a *pro se*

defendant. (Wotorson Affirmation, Exhibit "34," page 12, 13). Dash does not deny that during the course of that off-the-record conversation, he admitted to previously meeting with plaintiff in 1998. (Wotorson Affirmation, Exhibit "34," page 12, 13). As well, Dash did not deny during his own deposition, that he met with plaintiff in July 1998 concerning a manuscript that plaintiff had written entitled, "The Family." (Wotorson Affirmation, Exhibit "34," pages 15, 16, 18, 80; Exhibit "1"). Dash does not deny that he had more than one meeting with plaintiff about this manuscript. (Wotorson Affirmation, Exhibit "34," page 19). Dash also does not deny that his assistant in 1998 was a Carline Balan. (Wotorson Affirmation, Exhibit "34," page 21).

Earnest "Tron "Anderson, who is credited as being one of the writers of State Property I, testified that he began writing the treatment for State Property I in July 1998. (Wotorson Affirmation, Exhibit "35," page 65, 66, 72, 76). Anderson claims to have started writing the screenplay for State Property I in September 1998. (Wotorson Affirmation, Exhibit "35," page 76). Anderson further testified that he finished the first draft of the State Property I screenplay in October 1998. (Wotorson Affirmation, Exhibit "35," page 76, 77).

Dash does not deny that he had plaintiff call Michael Guido, Esq., to speak to him about a potential deal with Roc-A-Fella Films for the rights of his manuscript. (Wotorson Affirmation, Exhibit "34," pages 90, 91). Dash explained that he had used Michael Guido as an attorney in matters concerning Roc-A-Fella Records, but not Roc-A-Fella Films. However, he does not deny occasionally using Guido for Roc-A-Fella Films matters. (Wotorson Affirmation, Exhibit "34," pages 52, 53, 76).

Ernest "Tron "Anderson testified that he saw plaintiff's "book" in Dash's office on Dash's desk when he gave Dash his screenplay for State Property I.[1] Referring to plaintiff's book, Anderson asked Dash, "how was it?" Dash responded by saying "it was nothing." Anderson explained that the "book" that he saw on Dash's desk had puppet strings, and the words, "the Family," along with plaintiff's name as the author. (Wotorson Affirmation, Exhibit

---

[1] Anderson claimed in his deposition that he registered "Get down or Lay down," on the same day that he gave it to Dash. (Wotorson Affirmation, Exhibit "35," page 372, 373). Anderson claimed that he registered "Get down or lay down, screenplay registered on July 21, 1999. (Wotorson Affirmation, Exhibit "35," page 44).

"35," pages 105, 106, 107, 228, 229, 230, 231, 232, 232, 233, 234, 235, 236, 237, 238; Exhibit "1").

Dash testified that he recalled that plaintiff's book, "The Family" was on his desk in 1999 because Ernest "Tron" Anderson reminded him that it was on his desk in 1999 when Anderson met with him in his office concerning Anderson's proposed script for State Property I. During this 1999 meeting, Dash asked Anderson if he knew plaintiff, and Anderson told Dash that he did not. (Wotorson Affirmation, Exhibit "34," pages 151, 152, 153, 154). Dash explained that he remembered that the book was on his desk about "ten years ago," that the book had a picture of plaintiff on the cover, and that from looking at the picture, he thought that plaintiff did not look like a real gangster. (Wotorson Affirmation, Exhibit "34," pages 152, 153, 154).

Initially, Ernest "Tron" Anderson , who is credited as one of the writers of State Property I, testified that he was a "little bit" a part of JBM from 1988 through 1991. (Wotorson Affirmation, Exhibit "35," page 55). However, he later conceded that he was not a member of JBM. Instead, he explained that he merely knew a cousin of an alleged JBM Captain (Wotorson Affirmation, Exhibit "35," page 360, 361, 362, 364, 365, 368). In fact, Anderson admitted that "a lot" of his State Property screenplay was "made up." 20% of the story allegedly came from an actual federal indictment;[2] 40 % was made up; and another 40 % was based upon stories he had heard on the streets. (Wotorson Affirmation, Exhibit "35," page 366, 367, 368, 369). Anderson further testified that he never read any newspaper articles about the JBM and did not follow any news stories on the JBM organization. (Wotorson Affirmation, Exhibit "35," page 51). Anderson *did not* interview anybody or read any news in connection with writing the screenplay for State Property. (Wotorson Affirmation, Exhibit "35," pages 91, 92).

Ernest "Tron" Anderson testified in his deposition that he grew up in Philadelphia and

---

[2] Anderson testified that the theme of traveling to Florida to get cocaine was based upon a 100 paged federal indictment of Samuel Brown, that he got from Thomas Lawson, allegedly a cellmate of Samuel Brown. Anderson claims that he does not have copies of indictment anymore (Wotorson Affirmation, Exhibit "35," page Pages 80, 81, 82, 84). Samuel Brown has submitted an affidavit stating that he has not had a cellmate since 1996, and that he has never had a cellmate by the name of "Thomas Lawson." Moreover, a record search for "Thomas Lawson," did not show that any "Thomas Lawson" was incarcerated in the same facility with Brown. We also note that Brown *is not* incarcerated in a federal facility. (Wotorson Affirmation, Exhibits "25," "26," "27," "28").

that he did not graduate from high school. He obtained a GED in the Army, and went to six months of college. He did not take any courses or seminars in screenwriting. (Wotorson Affirmation, Exhibit "35," pages 13,14, 15, 16).

Anderson admitted in his deposition that his MySpace page has false information that he graduated in 1992 from college. In fact, he never graduated from college. The page also says that he went to graduate/professional school, and that his annual salary is at least $250,000 a year. In fact, Anderson is on social security disability. The only other sources of income for Anderson are occasional checks amounting to no more than $7,000 a year in acting and writing residuals. (Wotorson Affirmation, Exhibit "35," Pages 295, 296, 297, 298, 299, 300, 301, 302, 303, 304; Exhibit "14").

Anderson claims to be the co-writer of Hitch on his MySpace web page. (Wotorson Affirmation, Exhibit "35," page 280; Exhibit "14"). He also claims on his MySpace web page to have done the "rewrite" for Men In Black. Yet, he admits that he did not receive any credit for these efforts. (Wotorson Affirmation, Exhibit "35," page 283, 284). Anderson also claims to have done the rewrite for "Bad Boys," without remuneration or any credit. (Wotorson Affirmation, Exhibit "35," page 289, 290, 291; Exhibit "14;" Exhibits "18," "19," "20," "21," and "22").

At his deposition, Anderson told Tom Ferber, Esq., the attorney for Lionsgate Films, that he had Suge Knight call Damon Dash to get any money that Dash owed him. He claimed to know Suge Knight from Los Angeles, and he claimed that he was on the phone with Suge Knight. (Wotorson Affirmation, Exhibit "35," page 163, 164). Anderson was later forced to admit that he had lied under oath to Mr. Ferber about ever calling Suge Knight. (Wotorson Affirmation, Exhibit "35," pages 272, 273).

Anderson claims to have been on the set at least five times when State Property was being shot. Anderson agrees that many things in the movie are not in his screenplay, and that many things in his screenplay are not in the movie. Anderson offered that it is likely that changes were being made as movies being shot. (Wotorson Affirmation, Exhibit "35," pages 313, 315, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, 332, 333).

Damon Dash claims that he did not know Ernest "Tron" Anderson before he read Anderson's screenplay for State Property I. (Wotorson Affirmation, Exhibit "34," pages 85). In fact, Dash claims that his recollection of meeting with Anderson is vague, and that he does not

recall the specifics of any prior meetings with Mr. Anderson. (Wotorson Affirmation, Exhibit "34," page 86, 87). However, he did recall that Roc-A-Fella Films did not buy Anderson's script until it had a deal in place with Lionsgate Films. (Wotorson Affirmation, Exhibit "34," page 87; Exhibit "3").

Anderson spoke with Dash a month before his own deposition. Dash called him on his cell phone. During that conversation, Dash told Anderson that he would pay to him any money that he owed to Anderson's under his writer's contract for State Property I, if the agreement specified that any additional money was due to Anderson. During that conversation, Anderson told Dash that he recalled that plaintiff's "book" being on Dash's desk when he was delivering the State Property I. Dash did not deny, during his conversation with Anderson, that plaintiff's book had been on his desk some then (10) years ago. (Wotorson Affirmation, Exhibit "35," page 241, 242, 246, 247).

Anderson testified that he got rooms from plaintiff because he was moving and he needed a place to stay. Anderson agreed that he was using plaintiff as much as plaintiff was allegedly using him. (Wotorson Affirmation, Exhibit "35," page 359, 360). Moreover, Defendants claim in their moving papers that Anderson was intimidated when plaintiff said to him that, "we know where to find you." However, Anderson testified that he did not know what to make of plaintiff's comments, as they were followed by plaintiff's asking Anderson if he wanted free bible study. Anderson was aware that Jones is a Jehovah's witness, so, in Anderson's own words, he did not know "how to take it." (Wotorson Affirmation, Exhibit "35," page 348, 349).

As a President of Lionsgate Films' Film Production Division, Michael Paseornek is responsible for the development of movies from the early creative process through to the production of the movie (Wotorson Affirmation, Exhibit "33," pages 7-9). He explained that he deals with the creative aspects and the actual physical production of movies. (Wotorson Affirmation, Exhibit "33," page 8) . Moreover, he is responsible for *approving* versions of movie scripts on behalf of the Lions Gates Films. (Wotorson Affirmation, Exhibit "33," page 8).

In January 2000, Paseornek met with Damon Dash and Ron Rotholtz to discuss a proposed project that rapper, Jay-Z, was to appear in briefly, along with a new musical group called State Property and another rapper, Beanie Sigel, playing the lead acting role. Dash presented a script for the proposed movie which Paseornek read. (Wotorson Affirmation, Exhibit "33," pages 16, 18).

Lionsgate Films eventually agreed to finance the project for $500,000, but retained creative control over the script . (Wotorson Affirmation, Exhibit "33," pages 26, 28-8). Paseornek conceded in his deposition that Lionsgate Films had a financial interest in the exploitation of the proposed movie, and maintained a financial interest in distributing the movie. (Wotorson Affirmation, Exhibit "33," pages 31, 32). Dash admits that Lionsgate Films' agreement with Roc-A-Fella Films over the production and distribution of State Property I allowed Lionsgate Films to have approval authority over the script, the star talent and key creative elements of the project. Dash does not deny that Lionsgate Films had creative control over the final product. (Wotorson Affirmation, Exhibit "34," page 42, 43, 44; Exhibit "3"). Dash testified that he assumed Lionsgate Films was involved in the project to make money. (Wotorson Affirmation, Exhibit "34," page 42). Moreover, Dash does not deny that Roc-A-Fella Films and Roc-A-Fella Records were contractually obligated to share with Lionsgate Films, some percentage of the profits earned from State Property I's soundtrack. (Wotorson Affirmation, Exhibit "34," pages 45, 47; Exhibit "3").). Further, there were joint marketing efforts between Roc-A-Fella Films and Lionsgate Films concerning State Property I. (Wotorson Affirmation, Exhibit "34," page 76).

Dash explained that State Property I was initially supposed to be released on DVD, and not in theaters. (Wotorson Affirmation, Exhibit "34," page 39). However, Lionsgate Films decided to release it theatrically after showing it at the Urban Film Festival. (Wotorson Affirmation, Exhibit "34," page 39, 41; Exhibit "5").

Paseornek admitted that Lionsgate Films was the sole decision maker in releasing State Property I theatrically, as opposed to going straight to DVD, which was the original plan. (Wotorson Affirmation, Exhibit "33," page, 46, 50). Similarly, it was Lionsgate Films who was the sole decision maker over cross promotion of the movie. (Wotorson Affirmation, Exhibit "33," page, 52).

Paseornek explained that State Property II is a continuation of State Property I and was based on State Property I. (Wotorson Affirmation, Exhibit "33," pages 71-72). Dash also explained that the film, State Property II, is "a continuation of" State Property I and that the characters in State Property II were some of the same characters in State Property I. (Wotorson Affirmation, Exhibit "34," pages 97-98). Moreover, Dash explained that the storyline in State Property II was derived from State Property I. (Wotorson Affirmation, Exhibit "34," pages 97,

98).

Plaintiff's expert witness, Professor Robert Vianello, Ph.D. has found differences between the book and film, but finds that these differences are attributable to the adaptation process that takes place in making a film based on a book. The making of a film from a pre-existing book, in executing a marketing campaign targeting the youth market, requires condensation of character, plot, and action, as well as the addition of elements such as graphic sex, violence, and language. Plaintiff's expert witness concluded that the film, "State Property" was an adaptation from the preexisting novel, *The Family*: A Philadelphia Mob Story. (Affirmation, Exhibit "15").

<u>**ARGUMENT**</u>

I.     **LEGAL STANDARD**
   A.   <u>**Summary Judgment**</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment only when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." <u>See</u> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 202 (1986). The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. <u>Id</u>. at 256; <u>see</u> *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 91 L. ED. 2D 265, 106 S.Ct. 2548 (1986). The burden then shifts to the non-moving party to establish that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324. A fact is "material", if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>See</u> *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the moving party. <u>See</u> *D'Amico v. City of New York,* 132 F.3d 145, 148 (2d Cir. 1998), *cert denied*, 141 L.Ed.2 151, 118 S.Ct. 2075 (1998). In the context of copyright infringement, in order for summary judgment to be available, the *lack* of substantial similarity between the copyrightable aspects of the works must be "so clear as to fall outside the range of disputed fact questions", requiring resolution at trial. <u>See</u> *Warner Brothers, Inc. v. American Broadcasting Companies,* 720 F.2d 231 (2d Cir. 1983).

Moreover, courts have traditionally frowned upon granting summary judgment in copyright infringement cases because substantially similarity is customarily an extreme question of fact. See *Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1946); see *Hoeling v. Universal City Studios, Inc.,* 618 F.2d 972 (2d Cir. 1980).

## B.    Copyright Infringement

In order to establish a claim for copyright infringement pursuant to *17 U.S.C. § 501*, a plaintiff must show that: (1) he owns a valid copyright registration for the work at issue; (2) the defendant copied constituent elements of the work that are original. See *Feist Publishing, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed. 2d 358 (1991); *Bender v. West Publ. Co.,* 158 F.3d 693 (2nd Cir. 1998). A certification of registration made before or within five (5) years of publication of a work is prima facie evidence of the first element. See *17 U.S.C. §410(c)*. To satisfy the second element of an infringement claim, "a plaintiff must show both, that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003)(quoting *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998)).

Copying may be established either through direct evidence of copying or through indirect evidence of copying, including "access to copyrighted work, similarities that are probative of copying between the works and expert testimony". *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139-140 (2d Cir. 1992); see *Hogan v DC Comics,* 48 F.Supp 2d 298 (S.D.N.Y. 1999). There is an inverse relationship between access and probative similarity such that the 'stronger the proof of similarity, the less the proof of access is required.'" *Jorgensen,* 351 F.3d at 56 (quoting *3 Nimmer on Copyrights §*13.03[D] at 13-77). If actual copying is established, a plaintiff must show that the copying amounts to an improper appropriation by demonstrating that 'substantial similarity to protected material exists between the two works.'" *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998); see *Fisher Price, Inc. v. Well Made Toy Mfg. Corp.,* 25 F.3d 119 (2d Cir. 1994).

The test for substantial similarity is the "ordinary observer test" and the court considers whether the average lay observer would recognize challenged material as having been copied from copyrighted work. See *Historical Truth Products, Inc. v. Sony Pictures Entertainment,*

1995 WL 693189; see also *Flaherty v. Filardi*, 388 F.Supp2d 274 (S.D.N.Y. 2005). Moreover, in examining the similarities between two works, the court is to consider such aspects as the themes, total concept and feel of the two works, the characters, the plot and the setting. See *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996).

### a.    Probative Similarity

In determining whether two works are similar enough to prove actual copying, courts ask, "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Warner Bros. v. American Broad Cos.,* 654 F.2d 204, 208 (2d Cir. 1981)(citing *Ideal Toy Corp. v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir. 1966)). A court must examine the alleged similarities "in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting.

### b.    Actionable Infringement

After establishing that copying has occurred, a court must examine whether the "copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 75 (2d Cir. 1997). In undertaking this analysis, courts should be aware that

> *dissimilarity* between some aspects of the works will not automatically relieve the infringer of liability, for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.' It is only when similarities between the protected elements of plaintiff's work and the allegedly infringing work are of 'small import quantitatively or qualitatively' that the defendant will be found innocent of infringement.

*Williams v. Crichton,* 84 F.3d 581, 583 (2d Cir. 1996)(quoting *Rogers v. Koons,* 960 F. 2d 301, 308 (2d Cir. 1992)).

**POINT I**

**THERE ARE TRIABLE ISSUES OF FACT WITH RESPECT TO
SUBSTANTIAL SIMILARITY OF PROTECTABLE EXPRESSION
BETWEEN THE FAMILY AND STATE PROPERTY**

Defendant alleges in its brief that *State Property* is based on the screenplay entitled "Get Down or Lay Down" by Ernest "Tron" Anderson and that Anderson himself, based his screenplay on the real "JBM". In addition, Anderson testified that he based his screenplay on a number of sources, including but not limited to, the Junior Black Mafia, personal experiences and the affidavit of Samuel Brown as given to him from an unknown person named Thomas Lawson. Despite the allegations made by both the defendant and Anderson, there are stark distinctions between Anderson's Screenplay and *State Property*, but the similarities between *The Family* and *State Property* remain constant. It is not by mere coincidence that portions of Jones's original expression of ideas in *The Family* also appears in *State Property*, but *do not appear* in the Anderson Screenplay. Anderson offered no explanation and defendant submitted no evidence with its brief whatsoever, to explain this anomaly. Therefore, triable issues of material fact exist with regards to the manner in which portions of Jones's original expression came to appear in *State Property* but are but are noticeably absent from the Anderson Screenplay.

Below is a comparison of excerpts from the works now before this Honorable Court. When the works are analyzed in their entireties, and the target audience, the culture and the genre from which the works derive are taken into account, it becomes obviously apparent that the original expression of Jones' ideas as they appear in *The Family,* also appear in *State Property*.

**A. A Comparisons of Works Reveals Substantial Similarity of Protectible Expression
between *The Family* and *State Property***

I.    The Trip to Miami Beach, Florida

In *The Family*, the NRP crew initially received cocaine from an Italian supplier named Vinny, but soon realized that Vinny's small operation would not be able to satisfy their growing demand. Therefore, through Mark's connection, June, they eventually "cut out the middle man" namely Vinny, and began dealing directly with June (a main supplier) and his crew of Colombians that had a base of operations in Miami Beach, Florida. Mark handled the initial

12

introduction between June and Anthony, which ultimately led to a financially fruitful relationship. As a direct result of the initial transaction and the subsequent revenue, Mark and Anthony often made trips to Miami Beach to continue purchasing large amounts of cocaine at discount rates.

Excerpt from *The Family* – Upon reaching our destination, June was accompanied by three older Hispanic men. "¿Que pasa?" June said as he reached out to shake Mark's hand. "Long time, no see." "This is my friend Ant," Mark said as he formally introduced me. "These are my three bosses," June replied. "They do not speak English," June said while pointing, "but I will translate our conversation for them, and besides I have already told them about you guys coming to Florida." Anthony narrating: *I began to feel slightly uncomfortable because the older men just stared at us without uttering a word while June and Mark began speaking* …[3]

Anthony's description of the home of the Colombian cocaine suppliers: The house we journeyed to was immaculate. It was a 46-acre gothic building with two Olympic-sized pools, imported marble floors …[4] There is some brief dialogue between June, Mark and Anthony before June's bosses arrive. Anthony narrating: *The three of us continued talking before hearing a car pull up into the driveway.* June: "That's my bosses. Guys excuse me for a second," he explained while walking to the door. Anthony narrating: *Three men walked over to us, shaking our hands and speaking Spanish as if we understood.* "¿Que pasa, amigos?" one of the older men said. "Sientate por favor," the man voiced while motioning his hand toward a beauteous settee. Anthony narrating: *Mark and I looked at one another because, once again, we could not interpret what was said.*

In *State Property*, Beans' unnamed supplier advised him that he had to wait a week before he could purchase more cocaine. Therefore, through Baby Boy's connection, Mario, Beans eventually "cut out the middle man" and began dealing directly with Mario (the supplier) and his crew of Colombians that had a base of operations in Miami Beach, Florida. Similar to

---

[3] Jones, Antonne M. *The Family, A Philadelphia Mob Story*, pages 32-33 (Eldon Publishing, 1998)
[4] Jones, Antonne M. *The Family, A Philadelphia Mob Story,* pages 54-55 (Eldon Publishing, 1998)

*The Family,* Baby Boy handled the initial introduction between Mario and Beans, which led to a financially fruitful relationship. As a direct result of the initial transaction, they often made trips to Miami Beach in order to purchase large amounts of cocaine at discount rates.

Excerpt from *State Property- The scene opens with Beans and Baby-Boy pulling up to a mansion in Miami Beach with marble floors and an Olympic sized pool.*[5] *Beans* – "Aight look man, I wanna get in and out like a robbery … let's go up in here and get the fuck out cuz I don't trust these muthafuckers" … *Baby Boy*-"Yeah, I don't trust these Spanish talking muthafuckers either …" While inside the mansion there is dialogue between Mario, Beans and Baby Boy. *Mario*-"You guys want some drinks?" *Baby Boy*- "A couple shots of cognac" *Mario*-"Benito, ven aqui" *Beans*- "Nah Benito, whatever he said, we don't want no fuckin' drinks" … "We cool right now, aight …" After another exchange of dialogue, Mario exists with two other men and Beans engages in conversation with Baby Boy. *Beans*- "What the fuck is wrong with you man?" "We don't know these muthafuckers man, we just cut out the middle man – for all we know they'll have a thousand gwalas gwalas[6] run through here and kill us and take the money…" After that exchange, the parties met outside by the swimming pool. During the scene, Mario speaks directly to Baby Boy and comments on Beans' apparent feeling of discomfort. Mario then turns and speaks Spanish to one of the bosses. Neither Beans nor Baby Boy understand what is being said. After speaking Spanish to two men near the pool, the men walk over with two large duffle bags and two brief cases containing bricks of cocaine. Mario continues to speak Spanish. While Baby Boy is checking the cocaine for its level of purity, Beans comments to Mario. *Beans* – "Come on man, English …" "Stop talking that gwala gwala stuff …"

As opposed to both *The Family* and *State Property*, the protagonist ("AJ") in Anderson's Screenplay is notably absent from the meeting in Miami. Moreover, the setting in Anderson's Screenplay is a club named Club Mystic as opposed to the cocaine supplier's mansion. Furthermore, the Anderson Screenplay fails to set the groundwork for why the characters are in Miami. The scenes simply go from a violent shoot out on a basketball court, to a series of shots,

---

[5] State Property – Scene 9, 26:44 – 31:44
[6] Gwala Gwala is a derogatory term used primarily in the prison systems of New York, New Jersey, and Pennsylvania to describe people of Latin decent, such as Puerto Ricans, Dominicans, Colombians, and other Central and South Americans.

to the scene at Club Mystic.[7]

Excerpt from the Anderson Screenplay:

Baby Boy and D-nise come through the doors and marvels [sic] at the glamour of the club. *Baby Boy*- "This place is the shit!" *D-nise*- "Yeah nice, you seen where them dudes went?" While Baby Boy is searching the club, Mario walks up. *Mario*- "Welcome to South Beach!" "You like huh." [sic] After some exchanged dialogue between Mario, Baby Boy and D-nise, the three enter the club's office. After more dialogue, the group exits the club and drives to a warehouse somewhere in Miami in order to make the transaction.

In both *The Family* and *State Property*, it is the protagonist's right hand man that has the relationship with the main supplier, and it is he that sets up the meeting in Miami. Moreover, in both *The Family* and *State Property,* it is the protagonist's right hand man that introduces the main supplier to the protagonist. Also, what is noticeably absent from the Anderson Screenplay but is present in both *The Family* and *State Property* is the protagonist's feeling of discomfort being around Spanish-speaking individuals from whom he was purchasing kilos of cocaine. Therefore, triable issues of material fact exist with regards to the above-referenced excerpts that exhibit Jones's original expression stemming from the idea of traveling to Miami Beach to purchase kilos of cocaine as it appears in *The Family* and *State Property*, because a jury could reasonably conclude that the ordinary observer, unless set out to detect differences between the two works in this regard, would be disposed to overlook them. See *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir 2001); see also Folio Impressions v. *Byer California,* 937 F.2d 759, 766 (2d Cir 1991);  *Price v. Fox Ent't Group, Inc.*, 2007 WL 241389 (SDNY 2007).

---

[7] Anderson Screenplay, pages 29-30.

II.    <u>Pleading from the Love Interests of Both Protagonists to Stop Dealing Drugs After
       Witnessing a Murder</u>

In *The Family*, Anthony took his main love interest Lauryn and his daughter Shatora to
Puerto Rico for a much needed vacation. Although Lauryn was well aware of what Anthony and
his NRP crew were doing, witnessing Anthony's murder in her dream, caused Lauryn to plead
with Anthony to leave the fast life.

Excerpt from *The Family*- Anthony narrates the following: On the flight home, Lauryn
and I engaged in a lengthy conversation, where she pleaded with me to get out of the fast life
because of a dream she had in which I was killed. Usually, I paid little or no attention when she
would ask me to do such. But this time I actually considered it. *Anthony* – "Lauryn, you like nice
things, and so do I," I began to explain. "With working a regular nine-to-five you can't afford
those types of luxuries." *Lauryn*- "What is more important", she asked, "money or your
family?"[8]  Anthony's narration: I totally disregarded the question. Then I tried another
scapegoat. *Anthony*- "What about my boys? I cant' just leave them hanging, baby," I explained.
"Look, in due time I am going to get out of this shit."

In *State Property,* Beans' main love interest Iaasha witnessed her friend Tonya murdered.
Although she was well aware that Beans and his ABM crew were drug dealers and she accepted
the perks of such a lifestyle, but witnessing a murder caused her to go into a state of shock
wherein she pleaded with Beans to stop dealing drugs.

*Excerpt from State Property- Iaasha* - "They killed Tonya right in front of me" "They
killed Tonya right in front of me" *Beams* – "Come on, come on I know" … In the next scene
with Beans and Iaasha in their bedroom, Iaasha pleads with Beans to get out of the fast life.
Beans receives a phone call and the dialogue picks up after he hangs up. *Beans*- "Yo I'll be right
back, I gotta go do something right quick" … Beans turns to Iaasha and sees the look of
discontent and fear in her eyes. *Beans*- "What's wrong with you?" *Iaasha*- "You aint going
nowhere" … "You not goin' out this house …" *Beans* – "What, about that Tonya situation … the

---

[8] Jones, Antonne M. *The Family, A Philadelphia Mob Story,* pages 94-95 (Eldon Publishing,
1998)

16

kidnap …" "I told you I was gonna handle it" *Iaasha* – "I know you gonna handle it, I'm not worried about that I want your daughter to have a dad" "Look we got enough money-it's time for us to get out this shit and live like decent people …"[9]

Despite appearing in both *The Family* and *State Property,* Jones's original expression of the protagonist's main love interest pleading with the protagonist to leave the fast life after witnessing a murder is remarkably absent from the Anderson Screenplay. The Anderson Screenplay stops short after Beans rescues Iaasha after the kidnapping.

Excerpt from Anderson Screenplay:

*AJ-* "If she's got fucking [sic] hair outta place … *Boss-* "I told you I wouldn't touch her if you got my shit to me …" *AJ-* "This shit aint over" AJ slams the phone down and gets in the car. The scene resumes where AJ is rescuing Iaasha from the Art Museum. *AJ-* "Baby, did he hurt you?" *Iaasha-* "I'm okay, but …" *AJ* – "Shhh. Don't even say anything. That nigga's gonna die." Triable issues of material fact exist with regards to the above-referenced excerpts that exhibit Jones's original expression stemming from the idea of the protagonist's main love interest pleading with him to leave the fast life after she witnesses a murder, as it appears in *The Family* and *State Property*. The ordinary observer could conclude that there is substantial similarity between the two works with regards to Jones's original expression, unless set out to detect the differences between them. See *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir 2001); see also Folio Impressions v. *Byer California,* 937 F.2d 759, 766 (2d Cir 1991); *Price v. Fox Ent't Group, Inc.*, 2007 WL 241389 (SDNY 2007).

III.    Once the Protagonist Has Achieved a Certain Level of Success, He Relocates to the Suburbs

In *The Family*, Anthony realized that the fast life was becoming too violent and too unpredictable. Therefore, in order to protect his family, he purchased a home in Villanova, a suburb of Philadelphia for the specific purpose of keeping his distance from the city in which he set ablaze with cocaine.

---

[9] State Property – Scenes 18-19, 1:03 – 1:06:15-1:08:18

Excerpt from *The Family*:

Anthony narrating: *Our second baby was due in two months, and Lauryn wanted to purchase a bigger home. We looked at several houses in upstate Pennsylvania before deciding to move to Villanova.[10]  Moving to Villanova prohibited me from frequenting the city as much as I used to because of the time it took traveling back and forth. Many a night I would cruise across the city to observe the fruits of our labor.[11]*

In *State Property*, Beans realized that he had to keep his family and himself far from Philadelphia where he created a virtual battle zone. Therefore, he purchased a home in the suburbs to keep himself and his family safe.

Excerpt from *State Property:*

Beans is narrating while the scene is at his mansion during his daughter's Aja's birthday party: *Everything running smooth right now … I got a big crib out in the suburbs now, I aint out in the city with my boys, I aint gotta shit where I eat, my family doing good … brother making moves …[12]*

Despite appearing in both *The Family* and *State Property,* Jones's original expression of the protagonist moving away from the city to the suburbs to keep his family safe is noticeably absent from the Anderson Screenplay. Although the Anderson Screenplay places the group at the protagonist's mansion during the night where the AJ, Baby Boy and D-Nice are having a conversation concerning a situation involving the shooting of an "AJ look-a-like" that does not appear in State Property and at a mini-mansion one other time during the screenplay, the Anderson Screenplay fails to disclose to the viewer that AJ has in fact, moved to the suburbs in order to keep his family safe and maintain a safe distance himself from Philadelphia.[13] Triable issues of material fact exist with regards to the above-referenced excerpts that exhibit Jones's

---

[10] Jones, Antonne M. *The Family, A Philadelphia Mob Story,* pages 112 (Eldon Publishing, 1998)
[11] Jones, Antonne M. *The Family, A Philadelphia Mob Story,* page 113 (Eldon Publishing, 1998).
[12] State Property – Scene 4, 11:58-12:12
[13] Anderson Screenplay, pages 43, 44, 77.

original expression stemming from the idea of the protagonist moving away from the city to the suburbs in order to keep his family safe and to maintain a safe distance from the streets that he flooded with drugs and violence, as it appears in *The Family* and *State Property*. The ordinary observer could conclude that there is substantial similarity between the two works with regards to Jones's original expression in having the protagonist reside outside of the city for safety reasons, unless set out to detect the differences between them. See *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir 2001); see also *Folio Impressions* v. *Byer California*, 937 F.2d 759, 766 (2d Cir 1991); *Price v. Fox Ent't Group, Inc.*, 2007 WL 241389 (SDNY 2007).

IV.    The Motivation Behind Members of the Organization Killing an Original Member of the Organization

In *The Family,* three of the original four founding members, including Anthony, were made aware that Shawn, another founding member, was greedy and jealous of Anthony and therefore they set up side deals with a heroin dealer named Pakistani Mike. In return for Shawn's violation of the rules, he was set up by the founding members and ultimately murdered.

An excerpt from *The Family*:

Anthony narrating: *Also, Shawn had befriended a guy named Pakistani Mike, who was a big-time heroin dealer from Harlem who recently was doing business in Philly. Shawn knew better than dealing with anybody who was in the smack business.*[14] *About two weeks later we were informed by a reliable source that Shawn had instituted a partnership with Pakistani Mike in distributing heroin in Philadelphia, Camden and Newark, New Jersey.* "We are going to have to remove the weak link to tighten the chain," Dante expressed. "What do you mean? Kill him?" Mark questioned. "You're goddamn right," he answered. "Obviously he does not give a fuck about us, so why should we care about him? Dante rationalized. "He didn't offer to cut us in on the deal. This motherfucker is plain greedy."[15]

In *State Property*, Blizz, a founding member of the ABM, expressed greed, jealousy and

---

[14] Jones, Antonne M. *The Family, A Philadelphia Mob Story,* page 94 (Eldon Publishing, 1998)
[15] Jones, Antonne M. *The Family, A Philadelphia Mob Story,* pages 96-97 (Eldon Publishing, 1998)

envy about Beans to an unnamed member of the gang. The unnamed member relayed Blizz's contempt to Beans who, in turn, had Blizz set up to be murdered.

Excerpt from *State Property:*

 *Blizz-* "Yo man that nigga Beans got some of the fly ass shit over here" *Unnamed member* – "With all that money we getting now, Beans know how to hook a crib up" *Blizz-* "You mean all that money Beans is getting … Beans the one making all the real money … we the ones putting the in the real work … We the killers, niggas in the streets scared of … Beans aint no killer, he know he got us backing him up … If we had his connect we'll run this whole shit" *Unnamed member* – "Didn't you just buy a new car? Fuck you talking about Beans is getting all the money?" Beans approaches the two members having a conversation. *Beans* – "You Blizz I need you to hook up with Baby Boy and go holla at that nigga Shawn and go scoop up this cash for me" *Blizz-* "Aight, Boss Man" Blizz walks away, assumingly to meet up with Baby Boy. *Beans to the Unnamed member-* "What he talking about with all that 'boss man' shit?" *Unnamed member-* "Yo man you better keep an eye on that nigga … He talking about he gonna hook up you're your connect and start his own shit" *Beans* – "See that's one thing we can't tolerate – a snake ass nigga in this family … I got something for his ass."[16] After Blizz is murdered, Beans gives a speech of sorts. *Beans* – "I know y'all see we lost a lot of soldiers, some at war and some were disrespectful and disloyal and had to be dealt with." "We can't have no [sic] weak links in this family."[17]

 Anderson's Screenplay contains Jones's original expression of an original gang member setting up another original member to be killed based on his greed, envy and disloyalty.

V.  <u>The Use of a Love-Interest of a Founding Member to Set Up a Rival to be Murdered</u>

 In remaining constant with the theme of *The Family*, that the NRP are eliminating rival drug dealers that refuse to join their organization or be supplied by it, Anthony devised a plan to eliminate a rival drug dealer named Jabril by using a love interest named Kimmy, with whom he

---

[16] State Property – Scene 11, 33:20-34:53
[17] Id.

was romantically involved.

Excerpt from *The Family:*

Anthony's Narration: *I was told Jabril and his boys robbed two of our four houses for over seventy-two thousand dollars and two kilos.*[18] *I went straight home and called Kimmy to tell her I needed to see her right away. I devised a plan on how we were going to handle this bullshit with Jabril … and it included Kimmy's help.*[19] *Her (Kimmy's)  job was to get acquainted with him (Jabril) and lure him to the restaurant on Friday night. She did exactly that.* [20] *As she and Jabril entered the crowded room, she lead the way to a table in the back of the restaurant, which was strategically planned because it hindered the chances of Jabril escaping.*[21] Kimmy and Jabril are seating in the restaurant where the hit is going to take place. The two engaged in light conversation until Anthony gave her a signal. *Kimmy-* "All of you niggas is stressing me the fuck out," she uttered out of the blue. *Jabril-* "Stressing you the fuck out?" He questioned. "Hell I just me you …" *Kimmy-* "Some days, you are going to be the pigeon, and, some days you are going to be the statute …", she said sarcastically warned him. Anthony narrating: *He (Jabril) sat in a state of confusion and waited for her return.* Two men approach the table. *Jabril-* "Pardon me, dudes, these seats are taken," he informed them. *Hitman-* "We did not come here to talk, motherfucker …" Anthony narrating: *Jabril was hit with over fifty rounds in the head, neck and chest and he died immediately.*[22]

Also constant in the theme of *State Property,* that the ABM are eliminating rival drug dealers that refuse to join their organization or be supplied by it, Beans devised a plan to eliminate a rival drug dealer named Sharef by using an unnamed love interest, with whom Blizz was romantically involved.

Excerpt from *State Property:*

---

[18] Jones, Antonne M. *The Family, A Philadelphia Mob Story,* page 84 (Eldon Publishing, 1998).
[19] Id. at 84.
[20] Id. at 85.
[21] Id. at 85-86.
[22] Id. at 86-87.

A scene shows Blizz speaking with Sharef, where Blizz offers Sharef the opportunity to pay the ABM ten percent of all the money that they make. During the conversation, a "skagg", apparently Sharef's girlfriend, walks up. Although Sharef disrespects Blizz, Blizz and the "skagg" make eye contact and it is apparent to Sharef that the two have made a connection. The "skagg" thanks Blizz for giving her money and buying her clothes and jewelry in the ensuing scene. The two are intimate and Blizz puts Beans' plan in motion. *Skagg-* "Thank you Sweetie, you really know how to hook a sister up … Now I wanna hook you up with a little something." *Blizz-* "You know I gotta take you from that nigga Sharef …" *Skagg-* "What?" "That cheap motherfucker aint my man … I can do bad by my damn self. *Blizz-* "Forget all that … I need you to do a favor for me."[23] The following scenes show the "Skagg" and Sharef pull up to an apartment building where the "Skagg" tells Sharef that she will be right back. Sharef tells her to hurry up because he doesn't have all day, obviously unaware that she was setting him up to be killed. She walks to her door and gives the signal to Blizz who is sitting in an idling car across the street. Blizz pulls up next to Sharef and shoots him in the face.

Anderson's Screenplay contains Jones's original expression of the protagonist using a woman with whom a member of the gang was romantically involved to set up a rival gang member to be murdered.

The sequence in the aforementioned scene from *State Property* is nearly identical to where it appears in the Anderson Screenplay, obviating the need to insert an excerpt with regard to this particular point.[24] Triable issues of material fact exist with regards to the Jones's original expression deriving from the protagonist using a love interest of one of the founding members in order to have a rival gang member executed as it appears in *The Family* and *State Property*, because a reasonable jury could properly infer that substantial similarities with regards Jones's original expression in this context exists between the two works. *Fisher-Price Inc. v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119 (2d Cir. 1994); see *Laueryssens v. Ideal Group, Inc.*, 964 F.2d 131 (2d Cir 1992).

---

[23] State Property – Scene 11, 35:05 – 39:40.
[24] Anderson Screenplay, pages 41, 44-46.

**B.    Under The "Ordinary Observer Test" A Reasonable Jury Could Find that Defendants Unlawfully Appropriated *The Family*￼**

Unlawful appropriation exists if there is substantial similarity between the two works under the "ordinary observer" test, which asks "whether an average lay observer would recognize the alleged copy as having been appropriated form copyrighted work. *Ideal Toy Corp. v. Fab-Lu, Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966); *Arica Inst. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir. 1992). "The key to the ordinary observer test is therefore the similarities rather than the differences." *Gund, Inc. v. Applause, Inc.,* 809 F.Supp 304, 308 (S.D.N.Y. 1993). The test asks whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and describe the aesthetic appeal of the two works as the same." *Boisson v. Banian, Ltd.,* 273 F.3d 262 (2d Cir. 2001)(*citing Folio Impressions, Inc. v. Byer Cal.,* 937 F.2d 759 (2d Cir. 1991)).

It is unmistakable that *State Property* is substantially similar to *The Family*. No reasonable juror, upon reading *The Family* and viewing *State Property,* could find otherwise. *State Property* is substantially similar to *The Family* in total concept and feel, and in their expression of themes, characters, plot, sequencing, pace, setting, dialogue, mood and tone. We respectfully urge the Court to view the works in their entireties.

**C.    Defendant Grossly Mischaracterize the Alleged Scenes A Faire**

*Scenes a faire* are "incidents, characters or setting which reasonably stem from a given topic in a genre and do not enjoy copyright protection." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980).

Defendants have provided this Honorable Court with a copy of the film *New Jack City*, which stars Wesley Snipes, as well as, a DVD containing several excerpts from films that they claim contain *scenes a faire*. Defendants have conveniently chosen scenes that depict abstract ideas that necessarily flow from common themes. However, when these scenes are taken into consideration in conjunction with the film from which they derive, it becomes apparent that each scene is different in each film. For example, in *New Jack City*, Nino Brown killed his right hand man G-Money. It appears that he did so because G-Money was disloyal. However, when the film is viewed in its entirety, the plot suggests that Nino Brown killed G-Money because he became addicted to the very drugs that they sold and this sacrificed his ability to control his turf. As a

direct result, the police were able to infiltrate. G-Money was anything but disloyal. He constantly sought Nino's approval and when Nino claimed, "the world is mine" and subsequently took G-Money's girlfriend, it was G-Money that felt betrayed.

Defendants have mischaracterized several scenes in this manner and when each scene is viewed in conjunction with the entire film from which the scene derive, it becomes apparent that there are very different reasons for why 'the boss of the drug ring kills his right hand man'.[25] Another example of this mischaracterization is Defendants' allegation that it is common for successful drug dealers to move out of the city to purchase large homes. A brief analysis of any of the film excerpts provided by Defendants will show that none of the protagonists purchased expensive homes outside of the city in which they were operating. For example, in *New Jack City*, although Nino had an extravagant apartment, it was located within New York City. This is apparent because he was arrested in his home on the 6th floor of the apartment building.

A drug dealer moving out of the city into the suburbs is a relatively new phenomenon in urban films and within urban culture. In fact, it was once viewed as "selling out" if an individual moved to the suburbs. This notion has been quoted in rap lyrics and urban movies for over two decades.[26]  Therefore, the protagonist moving out of the city to the suburbs in *The Family* in 1998, the year in which the manuscript was completed is very novel.

---

[25] For example, Al Pacino as Tony Montana in Scarface killed his right hand man Manolo because he secretly married Tony's sister, Gina. It had nothing to do with being greedy, envious or trying to set up deals on the side. In fact, once Tony realized what he did, he uttered, "Cocksuckers killed Manolo".

[26] "Brothers pissed cuz you escaped and moved to the 'burbs"- Tupac Shakur on Makaveli. "No matter how much loot I get I'm staying in the projects forever" – Mobb Deep on The Infamous. "Yelling Compton but you moved to Riverside" – Ice Cube on Amerikkkas Most Wanted.

## **CONCLUSION**

For the foregoing reasons, defendants' Motions for Summary Judgment should be denied in its entirety, as there are numerous material issues of fact that can only be resolved by a jury.

Dated:  Brooklyn, New York
       May 13, 2008

                           Respectfully Submitted,
                           DUNLOP & ASSOCIATES, PC
By:                 /s/
                           Victor A. Dunlop (VAD-8571)
                           55 Washington Street, Suite 451
                           Brooklyn, New York 11201
                           (718) 403-9261 Telephone
                           (614) 455-9261 Facsimile

                           LAW OFFICES OF AMBROSE W. WOTORSON
By:                 /s/

                           Ambrose W. Wotorson (AWW-2142)
                           26 Court Street, Suite 1811
                           Brooklyn, New York 11201
                           (718) 797-4861 Telephone
                           (718) 797-4863 Facsimile