# Exhibit Y

| Plaintiff's Description of Claimed Similarity | Lions Gate's Response |
|---|---|
| **Response 1 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 47, 48)** | This claimed similarity of retrospective narration concerns a *scene a faire* common in the genre, as exemplified in the films *Goodfellas*, *Mobsters*, *Menace II Society*, *Get Rich or Die Tryin'*, and the BET's *American Gangster* documentary series episodes *The Chambers Brothers*, *Kenneth "Supreme" McGriff*, and *Rayful Edmond III*. |
| a) "'The Family' begins with its protagonist, Anthony, narrating a chronological, detailed story of how he and his crew, labeled the 'NRP,' reaches the pinnacle of the Philadelphia drug trade by taking over rival drug crews and mini-organizations by controlling the best quality and largest quantity of cocaine. Anthony is speaking of past events from a prison cell." | Moreover, the idea of a gang employing violence to eliminate or take over rival gangs also concerns an unprotectible *scene a faire* evidenced in other films such as *American Gangster*, *New Jack City*, *Menace II Society*, *Get Rich or Die Tryin'*, *Mobsters*, *American Gangster*, *The Public Enemy*, *Year of the Dragon*, *Hoodlum*, and from the lives of actual gangsters, as demonstrated by the BET documentary series *American Gangster* in the episodes *Felix "the Cat" Mitchell*, *Leroy "Nicky" Barnes*, *Rayful Edmonds III*, *Frank Lucas*, and *"Freeway" Ricky Ross* where the gangster's life is narrated through a series of letters from prison. |
| b) "*State Property* opens with its protagonist, Beans, narrating a chronological, detailed story of how he and his crew, labeled the 'ABM,' reached the pinnacle of the Philadelphia drug trade by taking over rival drug crews and mini-organizations by brute force and murder. The climax of State Property informs the viewers that Beans was also narrating from a prison cell." | |
| c) "The plot, setting, theme, overall essence, and feel of these two comparative elements are the same." | |
| **Response 2 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 49, 50)** | This claimed similarity is a mischaracterization of both works. Throughout *State Property*, the number of gang members fluctuates from two to six at any given time. In any event, the concept of a core group of four gang members, some designated with specific functions in the gang, is an unprotectible *scene a faire* apparent in the gangster genre readily apparent in the gangster films, *New Jack City*, *Get Rich or Die Tryin'*, *Mobsters*, and *Scarface*, as well as in the BET documentary series in the episode *The Chambers Brothers*. |
| a) "Relatively early in 'The Family,' Anthony introduces the readers to his most trusted associate and best friend, Mark and shortly thereafter the other two members of his crew, Dante and Shawn, the four which form the foundation of the 'NRP.'" | |
| b) "Relatively early in *State Property*, Beans introduces the viewers to Baby Boy, to whom he refers as his 'right hand,' as well as the remaining two members of the foundation of the 'ABM,' Blizz and D-Nice, thus also having a four member foundation." | |
| c)"The number of group members and the special bond between the leader and one group member are the same." | |

674309

| *Plaintiff's Description of Claimed Similarity* | *Lions Gate's Response* |
|---|---|
| **Response 3 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 51, 52)** | As a preliminary matter, the idea of specialized roles within a gang was central to the organization of the actual JBM, which Plaintiff admitted in paragraph 23 of his 56.1 Statement. (Lions Gate's 56.1 Statement at ¶ 23; Plaintiff's 56.1 Statement at ¶ 23). |
| **a)** "In 'The Family,' each member plays a specific role in the 'NRP' organization: Anthony is the leader and Mark is Anthony's 'right hand' and the 'muscle,' while Dante and Shawn play supporting roles such as controlling and organizing the 'NRP' street workers and purchasing firearms." | Moreover, this alleged similarity is mischaracterized. At no point in "The Family" is any gang member recruited based on any specific skill or responsibility, nor is anyone ever assigned one. This alleged similarity also concerns an unprotectible *scene a faire* common in the genre, as evidenced in the films *New Jack City* (each member is given an |
| **b)** "In *State Property*, each member also plays a specific role in the 'ABM' organization: Beans is the leader and Baby Boy is his 'right hand,' Blizz is the 'muscle' and D-Nice controls and organizes 'ABM' street workers along with his partner P-Nut (who was recruited after the 'ABM' was formed)." | assigned position during a meeting in the back of the nightclub), *American Gangster* (each member of the gang has a specialized role in the operation of the gang), *Mobsters* (same), and *Little Caesar* (leader introduces members of the gang and their specialties). |
| **c)** "The roles delegated to each member of the 'NRP' and the 'ABM' are substantially similar." | The idea that each member of the gang has a specific role is also commonly found in real life gangs, as depicted in the BET documentary *American Gangster* in the episodes *The Chambers Brothers* and *Philly Black Mafia*. |
| **Response 4 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 53, 54)** | The alleged similarity here, poor inner city youths conceiving a plan to engage in an illegal enterprise while in the back of a nightclub, concerns an exceedingly common *scene a faire* in the genre evidenced in the films *New Jack City* (idea to start selling crack and take over housing |
| **a)** "In 'The Family,' Anthony and Mark discuss the idea of selling cocaine in order to make large financial gains, but they both realize that they lack sufficient funds to purchase a large amount of cocaine. Shortly thereafter, the foundation of the NRP meet at the 'After Midnight' club in order to discuss their ultimate goal of 'taking over' the city of Philadelphia by controlling the city's drug trade." | project first conceived in back room of a nightclub), *Mobsters* (idea to start selling bootlegged Canadian whiskey conceived in back room of a speakeasy), and *Scarface* (idea of formally inducting Tony Montana into the gang and sharing plans to involve him in larger cocaine purchases discussed in back of a nightclub). |
| **b)** "In *State Property*, while sitting in an after hours club, Beans is complaining to Baby Boy about being broke and his desire for a large home, and that they need to come up with a large amount of purchase money in order to buy enough cocaine to take over the city of Philadelphia by controlling the city's drug trade." | As for the notion that "financial gain," as a reason for drug-dealing is protectible, that would be the almost universal objective for such activities. |

2

| *Plaintiff's Description of Claimed Similarity* | *Lions Gate's Response* |
|---|---|
| **c)** "The ideas of the leaders of each group to purchase a large amount of cocaine in order to take over the city of Philadelphia but lacking enough purchase money and discussing these goals in an after hours club are substantially similar." | |
| **Response 5 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 55, 56)**<br><br>**a)** "In 'The Family,' the 'NRP' decided their ultimate goal would be to have the rival drug dealers and mini-organizations either working for them or being supplied by them. Moreover, the motto associated with the gang in 'The Family' is *Be good or be gone.*"<br><br>**b)** "In *State Property,* after realizing the ultimate goal of the 'ABM' crew, which was to have the rival drug dealers and mini-organizations either working for them or being supplied by them or being murdered by them [sic], and after murdering a rival drug dealer named 'Futch,' Beans made it known that the motto associated with him and his ABM crew was to either *'Get down or lay down.'*"<br><br>**c)** "The ultimate goals of each group are substantially similar. The four (4) word phrase of each group leader to be used as an identifier are substantially similar." | This alleged similarity fails for three reasons. First, as Plaintiff admitted in his 56.1 statement, the motto "'Get down or lay down'" is the very motto employed by the actual JBM. (Lions Gate's 56.1 Statement at ¶ 18; Plaintiff's 56.1 Statement at ¶ 18). Second, the two mottos are entirely different and only share the word "or" in common. Third, the general idea that a gang employs a motto concerns an unprotectible *scene a faire,* as seen in *Get Rich or Die Tryin'* ("Getting paid and getting laid"), *Scarface* (1932) ("Do it first, do it yourself and keep on doing it.), *The Public Enemy* ("They buy our beer or they don't buy any beer"), *Scarface* ("The world is yours"), as does the idea of utilizing violence to consolidate power (see p. 1, *supra*). |
| **Response 6 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 57, 58)**<br><br>**a)** "In 'The Family,' the 'NRP' crew initially received cocaine from their connect [sic], 'Vinny,' but they soon realized that he would not be able to satisfy their demand. Therefore, they eventually 'cut out the middle man' and dealt directly with June and his crew of Colombians that had a base of operations in Miami Beach, Florida, to which they often traveled in order to purchase several kilograms of cocaine on each trip." | As with most of the cited similarities between the two works, the basis for the similarity is the actual events involving the JBM. The JBM was well known for having connections with Colombian cartels in Miami and would frequently travel there to purchase drugs long before either Plaintiff or Lions Gate incorporated this idea into their respective works, as Plaintiff admitted in ¶ 19 of his 56.1 Statement. (Lions Gate's 56.1 Statement at ¶ 19; Plaintiff's 56.1 Statement at ¶ 19).<br><br>Not only is "cut[ing] out the middle man" a hackneyed phrase, it is an unprotectible idea pervasive in the genre. Not surprisingly, when drug gangs, both real and fictional, attempt to cut out the middle man, |

| Plaintiff's Description of Claimed Similarity | Lions Gate's Response |
|---|---|
| **b)** "In *State Property*, Beans and Baby Boy realized that in order to get a larger quantity and better quality of cocaine at more competitive prices, they would eventually have to 'cut out the middle man.' Therefore, they traveled to Miami Beach, Florida to meet the new connect [sic], 'Mario' and his crew of Columbians [sic] in order to purchase several kilograms of cocaine." | they establish a connection with foreign suppliers, as depicted in the films *Scarface* (meets Colombian connection in Miami, and later travels to Bolivia to establish new drug connection), *American Gangster* (travels to Thailand to establish drug connection), and *Year of the Dragon* (same). |
| **c)** "Although there was no strife between them, both Anthony and Beans cut out the middleman and traveled themselves to Miami Beach, Florida in order to personally purchase larges kilograms of cocaine. The manner in which both leaders made conscious decisions to assume the risk involved in personally purchasing the weight of cocaine, as opposed to sending a worker, as well as, assuming the risk in whatever strife may develop by cutting out the middleman is the same." | The idea of cutting out the middle man is not limited to works of fiction, as many real life gangs, in addition to the JBM, rose to power by establishing a connection directly with the supplier, as depicted in the BET *American Gangster* documentary series in the episodes "*Freeway*" *Ricky Ross, Troy & Dino Smith, Rayful Edmond III,* and *Frank Lucas.* |
| **Response 7 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 59, 60)** | An appraisal of the purity of a drug is critical to any drug dealer's business and, not surprisingly, occurs frequently in the genre as seen in *Get Rich or Die Tryin'*, *American Gangster*, *Year of the Dragon*, *Scarface*, and *American Gangster* to name just a few examples. Thus, a discussion of the drug's purity is hardly copyrightable expression. |
| **a)** "In 'The Family,' while doing the deal in Miami Beach, Mark told Anthony that the cocaine they were getting was close to '90 percent pure.'" | |
| **b)** "In *State Property*, while in Miami Beach, after testing the cocaine that they were purchasing, Mario looked at Beans and Baby Boy and stated in part, 'See, es puro' (it's pure)." | |
| **c)** "The quality of cocaine purchased by each group is substantially similar." | |

4

| Plaintiff's Description of Claimed Similarity | Lions Gate's Response |
|---|---|
| **Response 8 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 61, 62)** | This is really part and parcel of the alleged similarity listed above. As discussed above, the idea of Colombian drug dealers did not originate with Plaintiff. In fact, as Plaintiff admitted in his 56.1 Statement, the actual JBM was renowned for dealing with Colombian drug dealers and would frequently travel to Miami to engage in drug deals with Colombian cartels. (Lions Gate's 56.1 Statement at ¶ 19; Plaintiff's 56.1 Statement at ¶ 19). As Spanish is the national language of Colombia and the first language of most Colombians, it is not surprising that both drug dealers speak Spanish. |
| **a)** "In 'The Family,' Anthony disclosed to Mark his feelings of discomfort with the new connect [sic] in Miami Beach because not only did they 'cut out the middle man,' but they did not understand the Spanish being spoken by the cocaine suppliers." | |
| **b)** "In *State Property*, Beans was extremely uncomfortable while in Miami Beach and expressed this to Baby Boy stating in part, 'I don't trust these Spanish speaking Gwala Gwalas'. . . . 'We just cut out the middle man.'" | To the extent both characters feel unease during their drug purchase from Colombian drug dealers, the respective sources of unease are disparate. In "The Family," Anthony feels discomfort stemming from the language barrier, whereas in *State Property*, Beans is uneasy because of the inherent dangers of engaging in a drug deal itself, much like the character in *Scarface*. Furthermore, the idea of tensions between different ethnic groups concerns a common *scene a faire*, as seen in *Hoodlum* (tension between African-American and Italian gangs, tension between Hispanic and Italians gangs including discomfort with Spanish being spoken), *Scarface* (tension between Colombian, Bolivian and Cuban gangs), *Mobsters* (tension between Jewish and Italian gangs), *Get Rich or Die Tryin'* (tension between Colombian and African-American gangs), and *New Jack City* (tension between Italian, Jamaican, and African-American gangs). |
| **c)** "The feelings of discomfort expressed by the leader of each group with the new suppliers based on the fact that the suppliers were speaking Spanish coupled with the fact that each group 'cut out the middleman' is the same." | Consistent with Plaintiff's superficial comparisons at the level of uncopyrightable ideas as opposed to protectible expression, the settings of the two drug deals are only similar to the extent that they both involve drugs and are conducted in a house. The similarities end there. The house in "The Family" is described as "A gothic building with two Olympic-sized pools." Not only is the drug dealer's house in *State Property* modern as opposed to Gothic (an architectural style noted for its counterbalanced buttresses, ribbed vaulting, and pointed arches), but there is only one pool which is clearly shorter than the 55 x 23 yards of an Olympic-sized pool. See |

| Plaintiff's Description of Claimed Similarity | Lions Gate's Response |
|---|---|
| | http://dictionary.reference.com/browse/gothic ("gothic"); http://dictionary.reference.com/browse/olympic-sized ("Olympic-sized"). |
| **Response 9 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 63, 64)** | This alleged similarity is premised on another mischaracterization by Plaintiff. In "The Family," Anthony is depicted as a pensive man who is frequently torn by the negative effects his drug-dealing lifestyle have on his family. Beans, on the other hand, is depicted as a homicidal sociopath who enters the drug business solely as a means to attain greater wealth and power and largely ignores its effect on his family other than the isolated incident -- not present in the "The Family" -- when his girlfriend is kidnapped. |
| **a)** "Throughout the plot of 'The Family,' although Anthony often speaks of the healthy relationship he desires with his girlfriend Lauren and their daughter Shatora, his actions prove otherwise as he almost completely ignores the two in favor of his business and another woman, Kimmy." | |
| **b)** "Throughout the plot of *State Property*, Beans often speaks of the healthy relationship he has with his girlfriend Aisha and alleges that he would do anything for his unnamed daughter; however, shortly after his daughter's fifth birthday party, he appears to completely ignore his daughter and Aisha in favor of his business and the 'ABM' crew." | In any event, the idea of a drug dealer prioritizing his business at the expense of family concerns an unprotectible *scene a faire* as depicted in *American Gangster* (gang leader refuses to leave his life of crime despite his wife's pleas that he do so for his family) and *Scarface* (gang leader relentlessly builds his criminal empire at the expense of his relationship with his mother and sister). |
| **c)** "The fact that each group leader expresses a desire to have a healthy relationship with their respective families, although neither character manifested his desire but instead showed more time, commitment and interest to their business and business partners is substantially similar." | |
| **Response 10 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 65, 66)** | This alleged similarity is an unprotectible idea that is common to any gang that aspires to control the drug trafficking business in a particular city or neighborhood, as evidenced by *New Jack City* (gang leader describes taking over Harlem drug trade), *Hoodlum* (same), *Scarface*, and *American Gangster*. |
| **a)** "In 'The Family,' after purchasing the large quantities of cocaine from Miami Beach, the 'NRP' crew members give a description of the manner in which they will take over city of Philadelphia, including giving detailed descriptions of which section of the city is controlled by which member of the 'NRP' crew." | |

| Plaintiff's Description of Claimed Similarity | Lions Gate's Response |
|---|---|
| b) "In *State Property*, after purchasing the large quantities of cocaine from Miami Beach, Beans gives a detailed description of the manner in which the 'ABM' crew was to take over the city of Philadelphia, including detailed descriptions of which section of the city is controlled by which member of the 'ABM' crew, stating in part, 'We [sic] taking over the city of Philly like John. Street.'" | |
| c) "The manner in which each member gave an accurate description of their plans to take over the city of Philadelphia, including each section of the city being assigned to each respective group is substantially similar." | |
| **Response 11 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 67, 68)** | Not only is this clichéd phrase not within the protections of the Copyright Act, but it is a phrase as old as the Bible, appearing in Psalm 128:2 of the New International Version, "You will eat the fruit of your labor; blessings and prosperity will be yours." Additionally, it is commonplace in the genre in films such as *New Jack City*, where the main character recites, "To the fruit of our hard work." |
| a) "In 'The Family,' Anthony describes the ability to 'enjoy the fruits of our labor,' referring to the hard work put in on the streets of Philadelphia by the 'NRP' crew." | |
| b) "In *State Property*, while having a meeting with the members of his 'ABM' crew and prior to rewarding them with women and jewelry, Beans describes the hard work put in on the streets of Philadelphia and that it is time to 'enjoy the fruits of our fucking labor.'" | |
| c) "The manner in which each leader acknowledges the hard work put in by their respective groups and describes it as 'the fruits of our labor' is substantially similar." | |
| **Response 12 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 69, 70)** | Once again, Plaintiff has based an alleged similarity on an element whose source can be traced directly to the actual JBM, the gang that terrorized the same Philadelphia neighborhoods where Plaintiff and Anderson both grew up, as Plaintiff admitted in paragraphs 1, 2 and 14 of his 56.1 Statement. (Lions Gate's 56.1 Statement at ¶¶ 1, 2, 14); Plaintiff's 56.1 Statement at ¶¶ 1, 2, 14). In the same document, in |
| a) "In 'The Family,' the 'NRP' crew shopped for diamond rings which they ultimately ordered from 'this Jewish Jeweler,' that were inscribed with the initials 'NRP,' to signify their unity and success." | |

| Plaintiff's Description of Claimed Similarity | Lions Gate's Response |
|---|---|
| **b)** "In *State Property*, Beans awarded himself and the members of the 'ABM' crew that were 'down from day one' with diamond rings that they purchased from 'Eli' played by Jacob Arabo a/k/a Jacob the Jeweler, that were inscribed with the initials 'ABM' to signify their unity and success." | paragraph 22, Plaintiff also admitted that the actual JBM was widely known for not only adorning themselves with flashy jewelry, but diamond rings encrusted with "JBM." (Lions Gate's 56.1 Statement at ¶ 22; Plaintiff's 56.1 Statement at ¶ 22). Finally, Plaintiff further admits in paragraph 28 and 29 of his 56.1 Statement, that Jacob the Jeweler, a/k/a Jacob Arabo, is a well known jeweler who has made much of his living selling diamond encrusted pieces of jewelry to hip hop stars. (Lions Gate's 56.1 Statement at ¶¶ 28-29; Plaintiff's 56.1 Statement at ¶¶ 28-29). |
| **c)** "The fact that the respective founding members of each group were awarded with diamond rings purchased from a Jewish jeweler, bearing the groups' respective initials, is the same." | Moreover, the similarity alleged by Plaintiff simply mischaracterizes the rings purchased in *State Property*. In *State Property*, Beans gives his cohorts plain diamond rings, whereas in "The Family" the rings are adorned with the letters of the gang. |
| | In any event, gang members adorning themselves with flashy jewelry is another unprotectible idea that concerns a *scene a faire* commonplace throughout the genre, as seen in *New Jack City*, *Scarface*, *Little Caesar* and *Original Gangstas* where the gang members can consistently be seen wearing flashy diamond jewelry. |
| | It is also common for gangs to name themselves and adorn themselves with the gang's name or abbreviation, as seen in *New Jack City* where the Cash Money Brothers, or "CMB," displayed the initials "CMB" on their clothes, hats, and even hair. |
| | Real gangs were also known for their flashy jewelry as seen in the BET documentary series *American Gangster* in the episodes *Lorenzo "Fat Cat" Nichols* and *Felix "the Cat" Mitchell*. |

| *Plaintiff's Description of Claimed Similarity* | *Lions Gate's Response* |
|---|---|
| **Response 13 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 71, 72)** | Plaintiff attempts to fashion an apparent similarity between the two plots where, in fact, the two situations are quite disparate. In "The Family," Anthony's girlfriend wants a home of her own in order to raise a family. In *State Property*, Beans wants a house only because it would make it easier to satisfy his desire to have sex. Furthermore, contrary to Plaintiff's assertions, there is nothing in *State Property* to indicate that Beans is moving out of the city for safety concerns. (Opp. Br. at 18). |
| **a)** "In 'The Family,' while pregnant with their daughter, Anthony's girlfriend advises him that she cannot stay in her parent's [sic] home any longer, thus alerting the reader that Anthony needed to purchase a home for himself and his family." | |
| **b)** "In *State Property*, while complaining to Baby Boy, Beans refers to having to sneak around his girlfriend's parent's [sic] home because they do not have a home of their own, thus expressing to the viewer that he desperately needed to purchase a home for himself and his girlfriend." | In any event, the desire to move out into one's own home is a common theme prevelant in films from the gangster genre including *Get Rich or Die Tryin'* (pregnant girlfriend implores gang leader to buy a house once the baby arrives) and *Menace II Society* (much of the story is driven by gangster's love interest pressuring him to leave Los Angeles, where he lives with his grandparents, for a new home with her in Atlanta). |
| **c)** "The fact that the leader of each group feels pressured by the living arrangement with their respecive girlfriends and this motivates them to make money at any cost in order to purchase a home is substantially similar." | Plaintiff similarly argues in his opposition brief that moving into a house in the suburbs is an idea protected by the Copyright Act. (Opp. Br. 17-19). However, the idea of moving into a new house is not protectible expression and concerns a common *scene a faire* in the gang genre, as seen in *Scarface*, *Menace II Society*, and *American Gangster*. |
| **Response 14 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 73, 74)** | Once again, the actual JBM, the ultra-violent Philadelphia drug gang on which *State Property* was based, was renowned for robbing and attacking rival gangs and factions, as Plaintiff admitted in paragraphs 14, 19, 20, and 21 of his 56.1 Statement. (Lions Gate's 56.1 Statement at ¶¶ 14, 19, 20, 21; Plaintiff's 56.1 Statement at ¶¶ 14, 19, 20, 21) |
| **a)** "In 'The Family,' the 'NRP' crew dealt violently with rival drug organizations that were robbing their dealers on the street corners as well as, robbing their 'stash houses.'" | Moreover, beyond the fact that this alleged similarity is based on actual historical events, Plaintiff ignores that the expression of these ideas is entirely different. In "The Family," it is Anthony's drug gang who is *robbed by other gangs*, whereas in *State Property*, it is Beans's gang who *commits the robbery*. As discussed above, the idea of gangs committing robberies or otherwise attacking rival gangs concerns a commonplace *scene a faire* as seen in *Scarface* and *Get Rich or Die Tryin'*. |
| **b)** "In *State Property*, the 'ABM' crew robbed rival drug dealers on the street corners as well as, rival dealers delivering to [sic] drugs to their 'stash houses.'" | |

| *Plaintiff's Description of Claimed Similarity* | *Lions Gate's Response* |
|---|---|
| c) "The fact that rival drug dealers were either being robbed by or robbing the members of the respective groups, as well as, involving their 'stash houses' is substantially similar." | |
| **Response 15 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 75, 76)**<br><br>a) "In 'The Family,' the men devised a plan to retaliate on [sic] a rival drug dealer named Jabril by using a woman that was romantically involved with a member of the 'NRP' in order to set Jabril up to be murdered."<br><br>b) "In *State Property*, the men devised a plan to set up Sharef, a rival drug dealer by using a woman that became romantically involved with a member of the 'ABM' crew, who in turn set up Sharef to be murdered."<br><br>c) "The fact that a woman who was romantically involved with a member of the respective groups and was used to set up a rival drug dealer to be murdered is substantially similar." | This alleged point of similarity represents another superficial mischaracterization by Plaintiff. As Plaintiff's own complaint recognizes, in "The Family," Anthony's mistress "sets up" a rival drug dealer, whom she never met, to be assassinated. In *State Property*, however, it is *the girlfriend of the rival gang member* who Beans uses to "set up" her boyfriend with whom she was already acquainted and romantically involved.<br><br>To the extent Plaintiff claims there is a similarity in the idea of gangs using women to assassinate a rival drug dealer, this idea is common in the genre as depicted in *New Jack City*, where Keisha, a cohort of the gang leader Nino Brown, assassinates a rival drug dealer. Furthermore, real life gangs as depicted in the BET documentary series *American Gangster* in the episode *Troy & Dino Smith*, used women as lookouts and decoys for the gang. |
| **Response 16 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 77, 78)**<br><br>a) "In 'The Family,' since the 'NRP' crew was making so much money and they figuratively took over the city of Philadelphia, they were forced to bribe the local police departments."<br><br>b) "In *State Property*, since the 'ABM' allegedly took over every section of the city of Philadelphia, Baby Boy was seen making bribery payments to the local police patrolling those sections."<br><br>c) "The fact that both groups were bribing local police departments in order to assure their businesses would prosper is substantially similar." | As one would expect, the idea of bribing police concerns a *scene a faire* in the gangster film genre, as seen in *American Gangster* and *Scarface*, where both gangsters are forced to bribe police officers as their criminal empire grows larger and attracts more attention.  Moreover, depictions of bribery present in "Fort Apache," a book about police and criminal elements in the South Bronx, were found to be unprotectible *scenes a faire*. Walker v. Time Life Films, Inc., 615 F. Supp. 430, 436 (S.D.N.Y. 1985) (holding the film *Fort Apache: The Bronx* did not infringe plaintiff's book), aff'd, 784 F.2d 44 (2d Cir. 1986).<br><br>In any event, Plaintiff fails to allege any similarity of expression in how the police are bribed, and instead is merely alleging that both works share the same unprotectible idea and concept. |

10

| *Plaintiff's Description of Claimed Similarity* | *Lions Gate's Response* |
|---|---|
| **Response 17 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 79, 80)** | This alleged similarity can also be traced to the real JBM, which was renowned for its internal disputes, which often ended with one member being murdered, as Plaintiff admitted in paragraphs 20 and 21 of his 56.1 Statement. (Lions Gate's 56.1 Statement at ¶¶ 20, 21; Plaintiff's 56.1 Statement at ¶¶ 20, 21). |
| **a)** "In 'The Family,' Shawn, a founding member of the 'NRP' crew, dealt with a heroin dealer in order to make more money, and this was viewed by remaining members as not only being greedy, but also as being disloyal to the 'NRP' crew. Ultimately, Shawn was set up by his own crew and murdered." | Beyond its shared historical basis, the idea of eliminating a fellow gang member is expressed very differently in the two works. In "The Family," it is Mark, a mere rank and file member of the gang, who not only conceives of the plan to murder Shawn as a punishment for his greed in pursuing an independent heroin venture in violation of the gang's code, but also commits the actual murder. Anthony, the putative leader, remains consistently opposed to the idea and even objects on several occasions, and plays no part in the execution. |
| **b)** "In *State Property*, Blizz, a founding member of the "ABM" crew, complained that Beans was the only member making 'any real money', and this was viewed by Beans and Baby Boy as not only being greedy, but also as being disloyal to the 'ABM' crew. Ultimately, Blizz was set up by Beans and killed in a shoot out with police." | In *State Property*, on the other hand, Beans, the gang leader, *unilaterally* makes the decision to eliminate Blizz. Contrary to Mark's motivation in "The Family," Beans reaches his decision solely based on Blizz's expressed *jealously* of Beans's seemingly disparate wealth. Unlike Shawn in "The Family," Blizz was *not* involved in any side drug ventures. Moreover, in stark contrast to "The Family," Blizz is not killed by a fellow gang member. Rather, Blizz dies as a result of a shoot out with the police which is set up by Beans. |
| **c)** "The fact that a founding member of each crew was seen as being disloyal and greedy and ultimately set up by their own crew to be murdered is substantially similar." | Even if the expressions of this idea were similar in the two works, the idea of a gang leader killing a fellow gang member who is perceived as disloyal concerns an unprotectible *scene a faire* exceedingly common in the gang genre, as seen in *Hoodlum* (gang member killed for attempted assassination), *New Jack City* (gang member killed for attempting to make a drug deal on the side and breaking the gang's code of ethics to not use drugs himself... "You cut a side deal... Yes, you did. Yes, you did, Gee."), *Little Caesar* (gang member killed for attempting to go to the police with information about the gang), *Untouchables* (same), *Get Rich or Die Tryin'* (gang member killed for attempting to work with rival gang) and *Scarface* (gang member killed for turning state's witness). |

11

| Plaintiff's Description of Claimed Similarity | Lions Gate's Response |
|---|---|
| **Response 18 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 81, 82)**<br><br>a)  "In 'The Family,' in reference to Shawn's obvious greed, a founding member of the 'NRP' crew blatantly stated, 'We are going to have to remove the weak link to tighten the chain.'"<br><br>b)  "In *State Property*, in reference to Blizz's obvious envy and greed, Beans blatantly stated, 'We can't have no [sic] weak links in this family . . .'"<br><br>c)  "The fact that a member of each respective crew not only recognized but expressed their opinion about another member's greed and both used phrase 'weak link' in describing the soon murdered members is substantially similar." | Once again, Plaintiff claims a similarity where there is none.  The two phrases are actually different and share only two words in common.  Moreover, it is axiomatic that simple words and phrases, particularly hackneyed expressions, like "weak link," are not copyrightable. |
| **Response 19 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 83, 84)**<br><br>a)  "In 'The Family,' Anthony's girlfriend begged him to "get out of the fast life" because she had a dream that he was killed. Hence, although she was aware that Anthony was a drug dealer and she accepted the perks of such a lifestyle, witnessing a murder in her dreams caused her to beg him to stop dealing drugs."<br><br>b)  "In *State Property*, Beans' girlfriend Aisha witnessed her friend Tonya murdered by a rival drug crew led by 'Boss Dame'. Although she was well aware that Beans and his 'ABM' crew were drug dealers and she accepted the home, jewelry and other perks, witnessing a murder caused her to go into a state of shock wherein she begged Beans to stop dealing drugs."<br><br>c)  "The role played by each leader's girlfriend in accepting the perks that come with such a volatile lifestyle but experiencing the same stimuli, namely a murder, and as a result begging each leader to stop dealing drugs is substantially similar." | Plaintiff mischaracterizes this alleged similarity between these two scenes, which are markedly dissimilar in copyrightable expression.  In "The Family," Anthony's girlfriend is vehemently opposed to Anthony's involvement in the drug business from the beginning.  Accordingly, Anthony keeps her largely insulated from its violent aspects.  Indeed, she never *witnesses* a murder but only *dreams* about it.  In *State Property*, on the other hand, Beans's girlfriend, Iesha, is largely complacent with Beans's criminal profession.  It is only after her *direct* exposure to violence after being kidnapped and *actually witnessing* the death of her friend (not her boyfriend as in "The Family") that she finally pleads with Beans to abandon his criminal life.<br><br>    To the extent Plaintiff claims the idea of a love interest begging the protagonist to get out of the gangster lifestyle, this concerns a *scene a faire* common in the gang genre, as seen in *American Gangster*, *Hoodlum*, and *Menace II Society*, where the love interests beg the gang member to abandon the gang lifestyle after witnessing a violent act. |

12

| *Plaintiff's Description of Claimed Similarity* | *Lions Gate's Response* |
|---|---|
| **Response 20 to Interrogatory No. 4 of Lions Gate's Second Set of Interrogatories (Complaint ¶¶ 85, 86)** | This alleged similarity has its roots with the actual JBM, which was renowned for using auto detailing shops as fronts for its illegal enterprises, as Plaintiff admitted in paragraph 24 of his 56.1 Statement. (Lions Gate's 56.1 Statement at ¶ 24; Plaintiff's 56.1 Statement at ¶ 24). |
| a) "In 'The Family,' Anthony owned several automobile detailing shops across the city as well as, in Camden, Trenton and Newark." | Again, this claimed similarity is mischaracterized in any event. First, C-zer's business in *State Property* appears to sell only car parts and nothing indicates it is a detailing shop. Even if both stores were |
| b) "In *State Property*, Ceaser [sic] was a character that owned an automobile detailing shop in Philadelphia and it was there that Beans shot him several times. Ceaser [sic] wound up being the character that was to ultimately testify against Beans putting him away for life." | detailing shops, however, the manner in which they appear in the works is entirely different. In "The Family," Anthony owns several detailing shops as fronts for his illegal enterprise. In *State Property*, Beans never owns a detailing shop. Rather, it is C-zer, a minor character unaffiliated |
| c) "The fact that an automobile detailing shop was even mentioned in both "The Family" and *State Property* is substantially similar." | with the gang, who owns the shop. The idea of an auto detailing shop in a film in the gangster genre is also an unprotectible idea and a *scene a faire*, as seen in *American Gangster*. |

13

# Exhibit Z

FROM :KJMPLLC                    FAX NO. :7184039593          Mar. 12 2008 03:05PM P1

**Wed, Mar 12, 2008  3:56 PM**

**Subject: IMS Expert Services - Search**
**Date:** Monday, February 4, 2008 4:00 PM
**From:** Mark Silver <msilver@ims-expertservices.com>
**To:** moreno@sundree.tv
**Conversation:** IMS Expert Services - Search

Victor:

It was a pleasure to speak with you regarding your need for experts in the above case. This email serves to summarize and confirm our conversation. **Please review the case background and expert requirements including the provisions that follow and reply with any changes or clarifications or confirm that all is correct and acceptable by replying in the affirmative.** We will then begin our search. After we have the 'specs' for this expert confirmed, I will forward to you the information for the damages expert/ Our understanding of the case background and requirements are as follows:

**Case Background:**
Our client, Victor Dunlop of Dunlop & Associates - Brooklyn, NY, represents the plaintiff, Antonne Jones, in this litigation alleging Copyright Infringement, Unfair Competition, Misappropriation , and related claims. These claims are in relation to a book Mr. Jones wrote: The Family - *A Philadelphia Mob Story.*

This case is filed in the USDC, Southern District of NY.

Mr. Jones is a well-known writer. In 1998 prior to "The Family" being published, Mr. Jones met with the defendants in an effort to sell them the rights to the story as the basis for a movie. The parties were unable to agree upon a price (Dash, Carter et al offered $50,000, Mr. Jones was desirous of being paid $500,000 for the rights). After their meetings, the defendants were to call back with a better offer, however, Mr. Jones never heard back from them.

"The Family" was subsequently successfully published and released in 1999.

In 2002, the defendants released their movie, entitled "State Property". The similarities between the story written by Jones and the movie were numerous and striking, according to the complaint. It is alleged that the movie is based upon Jones' book, and done so with disregard to the intellectual property owned by Jones.
(Shawn Carter is a/k/a "Jay-Z"  - a well known rap artist)
**Expert Required:**
We seek an expert in copyright issues, as they relate to book-to-movie rights and licensing. This expert will understand the legal implications involved in the licensing of the rights of a book/manuscript for the purpose of making a movie. He/she is likely an Attorney and/or personal agent of authors, and has experience in negotiating book-to-movie 'deals'.

FROM :KJMPLLC                          FAX NO. :7184039593                Mar. 12 2008 03:06PM P2

This expert will be expected to review case files and documentation as well as pertinent materials, such as the book and the movie screenplay. The expert will consult with and advise our client on the issues involved in book-to-movie deals of similar nature to the instant case. The expert will be expected to also opine in report, declarations and (if necessary) depositions and trial. Prior testimony experience is preferred, but not required. Document review, and report writing may be performed at expert's location. Meetings with counsel may be required in NYC. Depo and trial (if necessary) will be in NYC. An expert located in the NYC Area is strongly preferred.

**Parties:**
Defendants - Roc-A-Fella Films Inc., Lions Gate Films Inc., Damon Dash, Shawn Carter
Plaintiff - Antonne M. Jones

**IMS Requirements:** IMS accepts this search on an exclusive basis through February 25, 2008. We request that no other expert search or referral service of any kind be given your permission to search or submit candidates with regard to the expert needed in the case above until after this date. We will locate, evaluate and qualify a short list of experts that meet your needs. These experts will be presented to you within an information packet containing resumes, fee structures and an IMS contract. You have the opportunity to interview any or all of the candidates and you ultimately make the selection. You are not required to use a candidate provided by IMS, however should you use one of our experts you agree to engage them through IMS. All correspondence and discussions regarding the commercial aspects of this engagement will pass through IMS. This includes invoices, payments, discussions of fees, discounts and bids/proposals. As part of our service to both you and the expert, IMS manages all aspects of the contracts, invoices, collections and payments allowing you to focus on the case.

It is our standard practice to bill you every 30 days for time and expenses invoiced to us by the expert. Payment is due to IMS net 30. It is in the best interest of all parties' that we charge a retainer, to be paid upon the expert(s) engagement. We do this to attract and retain the best quality experts, with no concern on their part of having their fees contingent upon the outcome of the claim, and to avoid work stoppages due to late payments.

We pride ourselves on outstanding customer service. I will take care of everything that you need before, during and after the engagement. All case discussions and documents will be held in strictest confidence.

We appreciate the opportunity to serve you in this important matter and are confident that

you'll find IMS *ExpertServices* will meet or exceed your expectations.


Regards,


## Mark S. Silver

Client Manager
**IMS *ExpertServices***
Not Just Experts, Expertise
850.473.2530 Voice
850.473.2525 Fax
www.ims-expertservices.com <http://www.ims-expertservices.com/>
Denver ~ Pensacola ~ Atlanta

This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for the use of the addressee(s) named above. Any disclosure, distribution, copying or use of the information by others is strictly prohibited. If you have received this message in error, please advise the sender by immediate reply and delete the original message. Thank you.

# Exhibit AA

# DUNLOP & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION
55 WASHINGTON STREET, SUITE 451
BROOKLYN, NEW YORK 11201
(718) 403-9261 TELEPHONE
(614) 455-9261 FACSIMILE

March 5, 2008

<u>Via Facsimile (323) 343-6467</u>

Dr. Robert Vianello
570 Shepard Street
San Pedro, California 90731

Re:     *Jones v. Roc-A-Fella Films, Inc., et al. – 07 cv 3648 (KNF)*
        *Southern District of New York*

Dear Dr. Vianello:

This is to inform you that the plaintiff, **Antonne M. Jones**, in the above-styled action is interested in listing you as an expert witness based on our last conversation on or about March 5, 2008 and he may require your testimony at trial. Under the *federal* rules of civil of procedure, we are required to obtain the following items from you and to submit the same to the defendant(s) prior to *March 11, 2008*:

1.     A report detailing your analysis of the plaintiff's claim against the listed defendants for copyright infringement, included but not limited to a brief comparative analysis between the plaintiff's work, The Family, *A Philadelphia Mob Story*, and the defendants' work, *State Property;*

2.     A list of data or other information, including scholarly journals, treatises or articles that you *may* have relied upon in forming your opinions, diagnoses, and/or prognoses, if any;

3.     A list of any exhibits, including scholarly journals, treatises or articles that you *may* use at trial to summarize or to elucidate your opinions;

4.     A list of scholarly journals, treatises or articles that you *may* have authored in the last ten years;

5      A list of matters in which you have given testimony, under oath, as an expert

witness in the last four years;

6.    Your *curricula vitae* and any evidence that you are qualified to
      render the opinions contained in your report; and


7.    Your standard hourly rate for serving as an expert witness.


        Kindly contact me or Mr. Ambrose Wotorson, Esq. at (718) 797-4861 upon your
receipt of this correspondence to ensure we meet the court's deadline of ***March 11, 2008***.

Respectfully submitted,
DUNLOP & ASSOCIATES, P.C.

By:    _____
        Victor A. Dunlop


cc:    Ambrose W. Wotorson, Esq.
        Antonne M. Jones

# Exhibit BB

**Robert Vianello, Ph.D**
570 Shepard Street
San Pedro, California 90731
Home: 310 241-0804 Fax: 310 241-0806
Work:  323 343-4213  Fax 323 343-6467

**Academic Employment:**

1983 – 2003   **Professor**, Department of Communication Studies
Television, Film and Media Studies Area
California State University / Los Angeles

1992 – 2003 **Occasional Visiting Professor**,
Department of Film, Television and Digital Media
University of California at Los Angeles

**Teaching Specialties:**

The History of American Television
Ideological Analysis of Television Programming
Television Theory and Criticism
The Economics and Production Practices of the Television Industry
Television Advertising
Textual Analysis of Film

**Selected Graduate Courses Taught:**

*Television Programming*          California State University / Los Angeles
*Critical Theory of Film*              Department of Communication Studies

*Television Criticism*                 University of Southern California
                                                     Department of Cinema / Television

*Television History*                    UCLA
*Television Criticism*                 Department of Film / Television
*Television and Society*
*Contemporary Television Programming*

*Advanced Film and Video Production*  CSU Summer Arts
*Post Production in the Digital Age*       Course Coordinator

*The Aesthetics, Economics and*        Seminars with Professor Alan Bloom
*Production Practices of Music Video*   American Film Institute /
                                                           Sony Video Institute

**Professor Robert Vianello (cont'd)**

**Selected Administrative Experience:**

1988 -- 1995   Associate Chair, Department of Communication Studies
               California State University Los Angeles

1997 -- 2001   Associate Editor, JOURNAL OF FILM AND VIDEO
               University Film and Video Association

**Selected Publications:**

"The Rise of the Telefilm and the Networks' Hegemony over the Film Industry"
appearing in AMERICAN TELEVISION / New Directions in History and Theory
Edited by Nick Browne; Harwood Academic Publishers; USA 1994

"The Impact of Government Regulation on the Entertainment Industry in the Next
Ten Years" in THE FUTURE OF THE ENTERTAINMENT INDUSTRY published
by The Planning Forum, Spring 1989

LECTURES GIVEN BY AMERICAN PROFESSORS NICK BROWNE and
ROBERT VIANELLO ON AMERICAN TELEVISION published by China Central
Television in Beijing, The Peoples Republic of China

"The Power Politics of 'Live' Television" in THE JOURNAL OF FILM AND VIDEO,
vol. 37, number 3, Summer 1985

"Profile: Rock Videos" co-authored with Alan Bloom in NO! CONTEMPORARY
AMERICAN DADA, Published by The Henry Gallery of Art, University of
Washington; Seattle, Washington  (November, 1985)

"The Researchers Guide to Primary Television Materials in the United States," in
the QUARTERLY REVIEW OF FILM STUDIES (Special Issue on Television;
Winter 1985); Authored with Dan Einstein of the UCLA FILM AND TELEVISION
ARCHIVES

"La Domination de la TV americaine sur l'industrie cinematographique" translated
from the English in FILMECHANGE No.26 (Printemps, 1984) Paris

"Cinema, Televisione e Stato" in HOLLYWOOD IN PROGRESS: ITINERARI
CINEMA TELEVISIONE.  Edited by Vito Zaggarrio, Quaderni della Mostra
Internazionale del Nuovo Cinema:  "Hollywood 6" (Venice, Italy: Marsilio Editori,
1984) p.167-179

"La nascita del telefilm": in HOLLYWOOD VERSO LA TELEVISIONE GLI ANNI
'50 (Mostra Internazionale del Nuovo Cinema Internazionale Retrospettiva,
Ancona 13-18 dicembre 1983)

2

### Professor Robert Vianello (cont'd)

**Selected Production Credits and Awards:**

*(Co-Producer with Professor Alan Bloom / Second Unit Director)*

"TEACHING, IMAGINE IT"
(Spot Campaign Promoting the Teaching Profession)
Spokespersons: Edward James Olmos; Daphne Zuniga; LeVar Burton
*Awarded a "Telly"--the National Award for Public Service Announcements*

"IT'S MORE THAN JUST DOCTORS AND NURSES"
(Spots for Allied Health Care)
Spokespersons: Gates McFadden; Ada Maris

"LET THE BELLS RING"
(Music Video)
"GET THE POWER, GET AN EDUCATION"
(Thirty and Sixty Second Spots promoting education and teaching as a career to
Afro-American youth)
Spokespersons: LeVar Burton, Kim Fields, Roger Guenveur Smith
and over 10 other celebrities

"ALL YOU CAN DREAM"
(Music Video and Spots)
Spokespersons: Kareem Abdul-Jabbar, Ricardo Montalban
and some twenty other celebrities
*"Best Media Campaign of 1986"*
*Public Interest Radio and Television Society*
*"Silver Angel" / International Television Association*

*Producer on Various Music Videos as Teaching Projects for Production Students*

Coordinated intensive two week seminars in 35mm production including AVID
Digital Editing Experience for the California State University Summer Arts
Program

3

## Professor Robert Vianello (cont'd)

**Selected Papers, Panels, and Lectures:**

Lecture: "The Political Economy of American Television" given in the "Seminar on Popular Culture" on invitation by Dr. Elihu Katz, Dean of the Annenberg School of Communication / USC and University of Pennsylvania

Panel: "The Impact of Government Regulation on the Entertainment Industry in the 'Nineties" Southern California Planning Forum's Conference on "Strategic Issues in the Entertainment Industry"
  Other participants were:
    Stan Corwyn, President Warner New Media
    Lawrence Kirk, Corporate Director of Planning, MCA, Inc
    Barbara Watson, Vice President Strategic Planning, NBC
    Bill Hoagland, Director of Marketing, United Cable

Paper: "The Ideology of Television News in China and the United States" at the Society of Cinema Studies  and University Film and Video Association's (Combined Annual Conference)

Lecture: "Television Programming in the United States" and "Developing a Film and Television Studies Program" Beijing Broadcasting Institute in the Peoples Republic of China

Paper: "Network News in the People's Republic of China" Annual Conference of the Western Speech Association

Lecture: "Television Studies: The Emerging Discipline" to graduate students and faculty, Department of Cinema / Television, University of Southern California

Organized panel:
"Television Programming in the Era of Audience Fragmentation"
  Moderator: Nicholas Johnson, Former FCC Commissioner
    Panelists: Garth Ancier, Fox Broadcasting Company
      Chris Albrecht, V.P., Original Programming, HBO
      Danny Arnold, Writer/Director/Producer
       and Co-Creator of BARNEY MILLER
     Gary Franklin, Media Critic KABC

Co-Chaired Panels: 1) "The Business of Music Video"
       2) "The Art of Music Video"
University Film and Video Association's Annual Conference in Los Angeles

4

**Professor Robert Vianello (cont'd)**

Paper: "The Relationship between Major Film Production and Cable Television" Society for Cinema Studies Conference in Madison, Wisconsin

Lecture: "The Economic Structure of the Television Industry in the United States" Ph.D. Seminar, Department of Film and Television, UCLA

Lecture: "The Structure and Ideological Impact of Television Advertising in the United States" Ph.D. Seminar, Department of Film and Television, UCLA

Lecture: "Television, Advertising, and Ideology" NATIONAL ENDOWMENT FOR THE HUMANITIES SEMINAR in Los Angeles

Paper: "Television, Hollywood and the State" at the Mostra Internationale del Nuovo Cinema in Ancona, Italy

Lecture: "The Rise of the Telefilm and the Network Monopoly" at the SOCIETY FOR CINEMA STUDIES Annual Conference at UCLA

In the era of Public Affairs Programming, Appeared frequently on local talk shows on such topics as:
"The Business of Television"
"Television and Children's Advertising"
"Television and Education"
"The Fairness Doctrine"
"Television in China"

**Professional Services include:**

### Expert Witness regarding the Film, Television, and Television Advertising Industries

*Burgess v. The Coca-Cola Company*
Joseph B. Haynes and Norwood Jameson,
King & Spalding, Atlanta, Ga.

(My testimony defending The Coca-Cola Company's Intellectual Property of the Polar Bear "Always Coke" TV Ads in a one hundred million dollar litigation resulted in a Summary Judgment in favor of my client. Services included the creation of written and videotape evidence for the Court.)

*Zevallos v. Friedman*

(Testimony on Child Labor Practices in the Film and Television Industry)

5

**Professor Robert Vianello (cont'd)**

**Expert Witness (cont'd)**

*Dr. Melvyn S. Schwartz v. Multimedia*
                    Sonnenschein, Nath & Rosenthal, Los Angeles

(Testimony on Production Costs of Television Commercials)

*Nelson v. SCIE, LLC dba Entertainment Partners Services Group and related cases – Case No. 01E07974*

(Testimony on the relationship between the production practices of Motion Picture and Television industries)

**Education:**

M.A. and Ph.D.
Department of Film and Television
University of California at Los Angeles
(Awarded the Charles Boyer Fellowship to study at the
*Institute for Advanced Cinema Studies* in Paris, France)

Dissertation: "The Textual Analysis of the American Television Commercial"

B.A.
Major: Philosophy
Studied in Aix-en-Provence, France (Junior Year Abroad Program)
Kalamazoo College, Kalamazoo Michigan

**Personal Data:**

Health: Excellent
Height: 6' 3" / Weight: 195 lbs
Second Language: French

6